**CAPITAL CLEANING CONTRACTORS, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

**No. 97–1170.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1998.

Decided July 17, 1998.

---

Frederick D. Braid argued the cause for petitioner/cross-respondent, with whom James F. Kenniff was on the briefs.

Ana L. Avendano, Attorney, National Labor Relations Board, argued the cause for respondent/cross-petitioner, with whom Frederick L. Feinstein, General Counsel, Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Supervisory Attorney, were on the brief.

Before: GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.

GINSBURG, Circuit Judge:

Capital Cleaning Contractors, Inc. petitions for review, and the National Labor Relations Board cross-applies for enforcement, of a Board order holding that Capital is a successor employer within the meaning of *NLRB v. Burns International Security*

*Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Board held that Capital violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5), by discriminating in hire against the unionized employees of its predecessor, refusing to bargain with their union, and establishing without consulting the union the terms and conditions of employment it would offer initially to the union employees of its predecessor. Capital argues that (1) the Board's finding that Capital was a successor because it acted with anti-union animus in refusing to hire union workers is not supported by substantial evidence; (2) under *Burns* it was entitled to establish the terms and conditions of employment it would offer initially to the employees of its predecessor; and (3) the Board's remedial order is punitive. For the reasons stated below we reject Capital's first two arguments but agree that the Board's order is punitive; therefore, we grant in part and deny in part both the Company's petition for review and the Board's application for enforcement.

## I. Background

Until May 2, 1992 Ogden Allied Corporation had a contract to clean the Bulova Corporate Center in Queens, New York, for which purpose it employed 19 people. Local 32B–32J, Service Employees International Union, AFL–CIO was the exclusive bargaining representative of the Ogden cleaning employees. The collective bargaining agreement (CBA) between Ogden and Local 32 for the years 1990 through 1992 provided for wages of between $8.50 and $9.50 per hour and for medical and pension benefits.

In the Spring of 1992 the management of the Bulova building solicited competitive bids for a new cleaning contract. During the bidding process the manager of the building told Dennis Kaplan, the vice-president of Capital, that he was not pleased with the quality of the work Ogden had done. On April 10, 1992 Capital won the contract, and the Bulova building became Capital's largest job. As was its general practice, Capital staffed the building with a subcontractor, in this instance KCR Maintenance. Because Kaplan was concerned that KCR would not

be able fully to staff the Bulova building, however, he and KCR agreed that he could also hire some of the Ogden employees to continue working there. Indeed, Kaplan testified that because hiring the Ogden employees "could have made a very smooth transition," he would have hired all of them if they had passed the screening interview and if building management had approved.

Also on April 10 Anthony Spataro, the business agent of Local 32, learned about the Bulova building's switch from Ogden to Capital. According to Spataro, on April 14 he gave the Ogden employees copies of Capital's advertisement in the Yellow Pages and instructed them to call Capital and apply for a job. On April 15 Spataro drove to Capital's office in Huntington Station, New York and gave Al Kaplan, the president of Capital, a letter from the Union. The letter informed Capital that the Union represented the 19 Ogden employees; on their behalf it was making an "unconditional application for continued employment"; and it requested that Capital contact the Union's law firm "to commence negotiations." Dennis Kaplan testified that this request "seemed a little rough to us" because it was not a practice with which he was familiar and because Capital usually staffed a building with its own people. Spataro testified that he called Capital four times in mid-April and left messages for Dennis Kaplan, who never called back.

On or about April 20 Dennis Kaplan went to the Bulova Center with the following notice addressed to the Ogden employees:

> Effective May 2, 1992, we will be the new cleaning company at the Bulova Building. . . .

> Although a number of you have called our office, no one has submitted an application for work. The union which represents you with your current employer has written to us and stated that it is making an "unconditional application for continued employment" for everyone on a list which they enclosed. This is not sufficient to apply for work with us. You must call our office at [phone number] and ask for the Personnel Department. Tell them you are working at the Bulova Building, and that you are interested in applying for a job

> with us. Make an appointment to fill out an employment application, and bring satisfactory proof that you may lawfully be employed in this country. We will advise you of our decision after we complete a reference check.

> Starting wages are $5.00 per hour. We do not provide health insurance, and there is no pension.

Kaplan asked the building supervisor to distribute the notice to the Ogden employees and to post it near the employees' locker room. On April 27 Capital also mailed the notice to each Ogden employee by certified mail.

Also on that date Capital's law firm wrote to the Union, enclosing the notice offering jobs to the Ogden employees, and reiterating that the Union's blanket application was not sufficient; each employee would have to apply individually in order to get a job. The letter also stated that if Capital hired a majority of union employees, then it would bargain with the Union.

In the event, Capital did not hire any of the Ogden employees. At least three of the employees (Moore, Gallardo, and Mercado) testified that when they called Dennis Kaplan to apply for a job and informed him that they were Ogden employees, he said he was not hiring union workers. Others (including Diaz–Miranda, Mazurek, and Rojas) testified that Kaplan told them he did not need them because he was going to staff the job with his own people. Some of these employees in turn told their co-workers what Kaplan had told them.

Several of the employees testified that they did not apply for a job with Capital because Kaplan indicated that he would not hire them. One of the employees said he did not apply because the salary was too low, another because there were no benefits. Only one of the employees set up an interview for the job, and she testified that after one of her co-workers related his conversation with Kaplan she decided not to keep her appointment.

Dennis Kaplan testified that he spoke on the telephone with two or three Ogden employees about a job and told them about the

application procedure. Kaplan told some of the callers that the job paid $5.00 with no benefits. Kaplan denied, however, that he told any of the Ogden employees that he was not hiring union members or that there were no positions because he was bringing in his own people.

Capital took over the job on May 2. On May 6 the Ogden employees began picketing the building, which they continued to do through July.

On July 23 the General Counsel of the Board issued a complaint against Capital. A hearing was held before an Administrative Law Judge in March 1993 and in December the ALJ issued her decision. After observing that "much of the instant case rests on credibility determinations," she determined that Dennis Kaplan was "not a credible witness." Acknowledging that there were inconsistencies in the testimony of the Ogden employees, she concluded that these were due to the passage of time and to the employees' lack of sophistication and education. The ALJ then found that although two of the Ogden employees would not have applied for a job with Capital because of the low wage and lack of benefits, the other 17 would have applied and would have been hired by Capital but for its anti-union discrimination.

The ALJ also concluded that Capital was a successor employer to Ogden and that it was liable under §§ 8(a)(1) and (3) of the Act for refusing to hire union members, and under §§ 8(a)(1) and (5) both for failing to recognize and bargain with the Union and for unilaterally setting the initial terms and conditions of employment. The ALJ ordered Capital to reinstate the 17 affected Ogden employees, to bargain with Local 32, and to restore retroactively the terms and conditions of employment (including wages and benefits) called for in the 1990–92 CBA between Local 32 and Ogden. The wage and benefit remedy runs for the period from May 2, 1992 until such time as Capital negotiates in good faith with Local 32 and reaches either a new agreement or an impasse. The Board affirmed the ALJ's decision in all relevant respects.

## II. Analysis

Capital asserts that the ALJ's conclusion that it discriminated against union members is not supported by substantial evidence and that therefore it is not a successor to Ogden. Capital also claims that regardless whether it is a successor it was entitled to set the initial terms and conditions of employment without first consulting with Local 32. Finally, Capital argues that the remedy imposed upon it is punitive and therefore unlawful.

### A. Successorship

■■■ We will uphold the Board's findings of fact if they are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); *see Allentown Mack Sales & Serv., Inc. v. NLRB,* —— U.S. ——, ——, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998). To that end we ask "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack,* 118 S.Ct. at 823. As is apparent, this is a highly deferential standard of review. We give the Board even greater deference with respect to questions of fact that turn upon motive—in this case whether Capital's refusal to hire Ogden's employees was based upon anti-union animus. *See Laro Maintenance Corp. v. NLRB,* 56 F.3d 224, 229 (D.C.Cir.1995). Finally, "[t]he Court must uphold Board-approved credibility determinations of an ALJ unless they are 'hopelessly incredible' or 'self-contradictory,'" *Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB,* 921 F.2d 1275, 1281 (D.C.Cir.1990), or "patently insupportable," *Exxel/Atmos, Inc. v. NLRB,* 28 F.3d 1243, 1246 (D.C.Cir. 1994).

Under § 8(a)(1) of the Act it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their rights to organize, form, join, or assist a labor organization, and through it to bargain collectively. Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Under § 8(a)(5) it is an unfair labor practice for an employer "to refuse to bar-

gain collectively with the representatives of his employees."

■ When one employer buys out another or by competitive bidding displaces it, the new employer is under a duty to bargain with the union with which its predecessor bargained if (1) the new employer does not make a "significant change" in the "essential nature" of the business, and (2) "a majority of the new [employer's] employees were employed by the predecessor." *Elastic Stop Nut*, 921 F.2d at 1281; *see Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). Thus, the obligations of successorship depend upon whether "there is 'substantial continuity' between the new and predecessor employers." *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 937 (D.C.Cir.1998) (quoting *Fall River*, 482 U.S. at 43, 107 S.Ct. 2225). Although a new employer is not required to hire the employees of its predecessor, *see Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 261, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the new employer may not lawfully refuse to hire them because of their union affiliation, *see Fall River*, 482 U.S. at 40, 107 S.Ct. 2225; *Burns*, 406 U.S. at 280 n. 5, 92 S.Ct. 1571. In determining whether a new employer that did not hire its predecessor's union employees discriminated on the basis of their union membership, the Board looks to whether the employer was motivated by anti-union animus. *Elastic Stop Nut*, 921 F.2d at 1280. If so, then the new employer cannot escape its obligation to bargain with the union on the ground that the union does not represent a majority of its employees. *Id.* at 1282.

■ If the Board concludes that the new employer refused to hire the employees of its predecessor based upon anti-union animus, then the new employer may show as an affirmative defense that "it would have taken the [same] action regardless of the existence of such animus." *Id.* at 1280; *see NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403–04, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *Laro Maintenance*, 56 F.3d at 228; *Wright Line*, 251 N.L.R.B. 1083, 1089, 1980 WL 12312 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981). In other words, "a legitimate

business purpose may provide a defense even in the face of anti-union animus." *Elastic Stop Nut*, 921 F.2d at 1280.

Capital essentially concedes that it did not make any "significant change" in the "essential nature" of the business conducted by Ogden. Instead, Capital argues that it is not a "successor" to Ogden because it acted lawfully in not hiring a majority of its employees from among Ogden's workforce. In particular Capital contends that there is not substantial evidence for the ALJ's finding that it refused to hire the Ogden employees because of anti-union animus.

■ We hold that substantial evidence does support the ALJ's finding that Capital refused to hire 17 of the 19 Ogden employees because of their union membership. The evidence shows that Dennis Kaplan (whose denial the ALJ discredited) informed several of the Ogden employees that he did not want to hire union members. These employees in turn told their co-workers about Kaplan's statements. The ALJ could infer from this evidence that even the employees who did not talk to Kaplan decided not to apply because of Kaplan's antiunion statements. *See, e.g., NLRB v. Staten Island Hotel Ltd. Partnership*, 101 F.3d 858, 861 (2d Cir.1996) (upholding finding of anti-union animus from statements such as manager "wasn't going to hire anybody from the union").

Capital mounts four attacks upon this conclusion, none of which is persuasive. First, Capital asserts that the ALJ improperly discredited Dennis Kaplan's testimony denying that he told the Ogden employees he was not hiring union members. The ALJ rejected Dennis Kaplan's testimony on the grounds that it is internally inconsistent and that he attempted to signal an answer to Al Kaplan when the latter was testifying. As to the inconsistency, Dennis Kaplan testified, on the one hand, that in order to ensure a "smooth transition" he would have hired all of the Ogden employees if they had passed the screening and if building management had approved and, on the other hand, that he thought the Union's unconditional blanket application was "a little rough." As the ALJ found, these statements are in some tension;

in these circumstances it is not our role to draw from the evidence inferences different from those the ALJ drew. *See Caterair Int'l v. NLRB,* 22 F.3d 1114, 1120 (D.C.Cir.1994). As for the ALJ's reliance upon Dennis Kaplan's attempt to signal an answer to Al Kaplan during the latter's testimony, Capital does not deny the attempt but contends only that Al did not see Dennis signal and that Al's testimony was itself consistent. Neither point is even relevant: The ALJ could properly draw a negative inference regarding Dennis Kaplan's credibility based upon his attempt to influence the testimony of another witness during the hearing regardless whether that attempt succeeded.

Second, Capital disputes the accuracy of Spataro's testimony that he met with the Ogden employees, gave them Capital's telephone number, and told them to apply for a job. Although there are inconsistencies in the testimony, several Ogden employees indicated generally that such a meeting occurred. In any event, the Spataro meeting is not, contrary to Capital's claim, the "cornerstone" of the General Counsel's case, nor even a necessary factual predicate for the ALJ's determination that Capital refused to hire the Ogden employees because of anti-union animus. There is no dispute that at least some of the Ogden employees called Capital to inquire about a job: Dennis Kaplan so testified and the notice Capital mailed to the employees stated that "a number of you have called our office." The relevant issue is whether Dennis Kaplan told the employees who called that he was not hiring union members—not, as Capital would have it, whether a union representative or someone else told the employees to apply.

Third, Capital contends that this court should itself discredit the testimony of the Ogden employees to the effect that Kaplan made anti-union statements. Capital here refers to certain inconsistencies and minor contradictions in the testimony of the employees upon matters other than the relevant question—that is, whether Kaplan made the anti-union statements. The ALJ specifically credited the employees' testimony upon this issue. The problems to which Capital points do not, even in the aggregate, rise to a level

that would cast doubt upon the ALJ's decision to credit the relevant testimony. In addition, the ALJ specifically credited the testimony of two of the employees based upon their "demeanor" and apparent "truthful[ness]," and we cannot say that their testimony is "hopelessly incredible." *Elastic Stop Nut,* 921 F.2d at 1281 (upholding ALJ's decision to credit testimony of witness claiming he was told to limit the hiring of union members).

Fourth, Capital suggests that we should discredit the Ogden employees' testimony about Dennis Kaplan's anti-union statements because several of those employees required a translator for their testimony. Be that as it may, several witnesses testified in English when recounting their telephone conversations with Kaplan. Indeed, all the most damning witnesses—those who testified most clearly that Kaplan said he was not hiring union members (Moore, Gallardo, and Mercado)—testified in English about their conversations with Kaplan.

▆▆▆ Notwithstanding this substantial evidence that Kaplan told the Ogden employees that he would not hire union members, Capital argues that it is not a successor because it did not hire a majority (or indeed, any) of Ogden's employees. Capital contends that it did not (and could not) hire any Ogden employees because they simply did not apply, and that they did not apply because they were not satisfied with the terms Capital offered. Although several of the Ogden employees did testify that they were not happy with the terms offered by Capital, only two of them (Reinoso and Rojas) gave either the low wage or lack of benefits offered by Capital as the sole reason they did not apply, and the ALJ properly excluded those two from relief under the order. More important, several of the employees testified expressly that they did not apply because of Kaplan's statements. And as noted above, those employees told their co-workers what Kaplan had said, making it a fair inference for the ALJ that the other employees did not apply for the same reason. In short, we agree with the Sixth Circuit that "where an employer makes known to prospective employees his refusal to hire them because of union affilia-

tion, their failure to apply is no defense." *American Press, Inc. v. NLRB*, 833 F.2d 621, 627 (1987).

 Capital's final argument is that regardless whether it acted with anti-union animus to discourage Ogden's employees from applying for jobs, it would lawfully have refused to hire most of them if they had applied. Capital contends that it would not have hired a majority of union employees because the building management had expressed dissatisfaction with Ogden's performance. There was no testimony, however, that the building management had singled out any individual employees. Therefore, Capital has failed utterly to show that it would not have hired a majority of its employees from among Ogden's workers absent its anti-union animus.

In sum, Capital was a successor to Ogden. It violated §§ 8(a)(1) and (3) by refusing to hire the Ogden employees because of their union membership, and it violated §§ 8(a)(1) and (5) by refusing to recognize and bargain with the union.

## B. Setting the Initial Terms

Capital argues that even if it did engage in anti-union discrimination it did not violate §§ 8(a)(1) and (5) of the Act by unilaterally—that is, without first bargaining with the Union—setting the initial terms and conditions under which it would hire the Ogden employees. Citing *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), Capital argues that it was entitled to set the initial terms and conditions upon which it would offer employment when it won the bid for the Bulova office building. In *Burns* the employer hired a majority of its employees from among the employees of its predecessor but refused to bargain with their union. *Id.* at 275–76, 92 S.Ct. 1571. The Board held that the employer had violated § 8(a)(5) and as a remedy imposed upon it the CBA that had been signed by its predecessor. Although the Supreme Court agreed with the Board that Burns had a duty to bargain with the union representing the employees of its predecessor, *id.* at 277–81, 92 S.Ct. 1571, it did

not agree with the Board's choice of a remedy. As the Court stated:

> It does not follow ... from Burns' duty to bargain that it was bound to observe the substantive terms of the collective-bargaining contract the union had negotiated with [the predecessor] and to which Burns had in no way agreed.

*Id.* at 281–82, 92 S.Ct. 1571. The Court explained:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U.S.C. § 159(a).

*Id.* at 294–95, 92 S.Ct. 1571.

 Thus, the general rule of *Burns* and its progeny is that a successor employer is, like any non-union employer, free to set the initial terms upon which it offers employment. In the ordinary case the successor's obligation to bargain with the union accrues only when it has hired a "substantial and representative complement" of its work force, *Fall River*, 482 U.S. at 47, 52, 107 S.Ct. 2225 (clarifying timing of bargaining obligation), and a majority of those employees were employed by its predecessor. If it is "perfectly clear" *ex ante*, however, that the successor employer "plans to retain all of the employees in the unit," then *Burns* requires the successor to bargain with the union even before setting the initial terms of employment. *Burns*, 406 U.S. at 294–95, 92 S.Ct. 1571. This has come to be known as the "perfectly clear" exception to *Burns*.

In *Burns* the Court did not address a situation where the successor, based upon anti-union animus, unlawfully refused to hire

the employees of its predecessor. For cases involving such discrimination the Board has adopted what it calls in its brief a "corollary" to the perfectly clear exception: If the successor employer refuses to hire its predecessor's employees because of anti-union discrimination, then the Board presumes that but for the unlawful discrimination the new employer would have hired all or substantially all of those employees when it first started hiring. The Board's rationale for this presumption is that when a new employer discriminates against union adherents the remedy is to instate or reinstate them; assuming therefore that they had been employed all along, it is reasonable further to assume that a majority of the employees are in favor of the union. It follows that the employer had an obligation from the outset to bargain with the union. *See, e.g., Kallmann v. NLRB,* 640 F.2d 1094, 1100–01 (9th Cir.1981).

In effect, when a successor refuses to hire its predecessor's employees based upon anti-union animus, the successor loses the right unilaterally to set the initial terms and conditions of employment; it must first bargain with the union. In upholding the Board in this respect we join every other court to have considered the issue. *See, e.g., Pace Indus., Inc. v. NLRB,* 118 F.3d 585, 593–94 (8th Cir.1997); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1320 (7th Cir.1991) (en banc); *American Press, Inc. v. NLRB,* 833 F.2d 621, 624–25 (6th Cir.1987); *Shortway Suburban Lines, Inc.,* 286 N.L.R.B. 323, 328, 1987 WL 89958 (1987), *enf'd mem.,* 862 F.2d 309 (3d Cir.1988); *Potter's Drug Enterprises, Inc.,* 233 N.L.R.B. 15, 20, 1977 WL 9246 (1977), *enf'd mem.,* 584 F.2d 980 (9th Cir.1978); *see also Karl Kallmann d/b/a Love's Barbeque Restaurant No. 62,* 245 N.L.R.B. 78, 82, 1979 WL 9929 (1979) (applying perfectly clear exception because of uncertainty caused by failure to hire union members due to anti-union animus), *enf'd in relevant part,* 640 F.2d 1094 (9th Cir.1981).

We conclude that the Board was correct in holding that Capital violated §§ 8(a)(1) and (5) of the Act by setting its initial terms and conditions of employment without first bargaining with Local 32. Having earlier determined (in Part II.A) that

Capital was a successor employer to Ogden, we now hold that because Capital refused to hire the Ogden employees based upon their union membership, the Board properly presumed that but for such discrimination Capital would have hired a majority of the Ogden employees from the outset. Accordingly, Capital had a duty to bargain with Local 32 and therefore did not have the right unilaterally to set the terms and conditions upon which it offered employment.

Capital raises two arguments to the contrary but they are both misconceived. First, Capital asserts that the Board's corollary to the perfectly clear exception is inconsistent with *Burns.* In *Burns,* however, the successor did not violate the Act by unlawfully refusing to hire a majority of union employees. On the contrary, the successor did, in fact, hire them; its dereliction was in failing to bargain with their union. For that unfair labor practice the proper remedy was a bargaining order. In a case like this, however, where Capital's antiunion discrimination makes it difficult to determine how many of its predecessor's employees it would have hired if it had not unlawfully discriminated against union adherents, it is only reasonable for the Board to presume that the successor would have hired a majority of union members and therefore had an obligation from the outset to bargain with the union rather than unilaterally setting the terms of employment. Therefore, the Board's reasoning is consistent with the perfectly clear exception in *Burns.* The other cases upon which Capital relies, *Spruce Up Corp.,* 209 N.L.R.B. 194, 1974 WL 4741 (1974) (interpreting the perfectly clear exception), *enf'd mem. sub nom. Stone and Webster Engineering Corp. v. NLRB,* 510 F.2d 966 (4th Cir.1975), and *International Association of Machinists and Aerospace Workers v. NLRB,* 595 F.2d 664 (D.C.Cir.1978) (approving the Board's reasoning in *Spruce Up*), are inapposite because the successor employers there did not discriminate against union adherents.

Second, Capital asserts that its case is unique because it expressly offered employment to its predecessor's unionized employees. That is true in form but not in substance, for as we have seen Capital actively

discouraged the Ogden employees from applying by telling them that it was not hiring union members.

In sum, because Capital refused to hire the Ogden employees based upon anti-union animus, the Board properly presumed that absent discrimination Capital would have hired a majority of union members, and therefore had a duty to bargain with the Union. The Board also correctly held that by refusing to hire union members, Capital lost its right to set the initial terms and conditions of employment, and hence violated §§ 8(a)(1) and (5), when it nonetheless set wages and working conditions without first bargaining with the union.

## C. The Remedy

Capital's final argument is that the Board's remedy for its violations—requiring it "to restore retroactively [the] preexisting terms and conditions of employment" set forth in the CBA between Ogden and Local 32—is unlawful because it is a penalty. We agree.

 Preliminarily the Board contends that Capital waived this argument by failing to raise it with sufficient specificity before the Board. *See* 29 U.S.C. § 160(e); 29 C.F.R. § 102.46(b)(1). Capital told the Board in its exceptions to the decision of the ALJ that it objected "to the entire Remedy ... because ... there were no violations of the Act." That broadside is sufficient in the circumstances of this case, however, under the Board's regulation providing:

> If a supporting brief is filed the exceptions document shall not contain any argument or citation of authority in support of the exceptions, but such matters shall be set forth only in the brief.

29 C.F.R. § 102.46(b)(1). Capital clearly did make the present argument in its brief to the Board when it stated (among other things) that

> ordering Capital to institute the terms in effect under the Ogden–Local 32 collective bargaining agreement would not only be violative of *Burns*, but it would also be an unlawful, punitive order at odds with the purposes of the Act.

We think Capital complied with its obligations under both the statute and the regulation when it alerted the Board in its exceptions that it objected to the remedy and then stated its specific reasoning in its brief to the Board. Certainly the Board cannot contend that it lacked notice that Capital was making this argument. *See Consolidated Freightways v. NLRB*, 669 F.2d 790, 794 (D.C.Cir. 1981) ("[T]he critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal"). Accordingly, we hold that Capital did not waive its objection to the Board's remedy.

 As to the merits, we hold that the Board's remedy is punitive and therefore unlawful. Section 10(c) of the Act states that the Board may issue

> an order requiring [a person who committed an unfair labor practice] to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act].

29 U.S.C. § 160(c). The Supreme Court has more than once indicated that the goal of the remedy is "to restore the situation 'as nearly as possible, to that which would have obtained but for the illegal discrimination.'" *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941)). That is, the Board's remedy must be truly remedial and not punitive. *See NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10–12, 61 S.Ct. 77, 85 L.Ed. 6 (1940); *Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 888 (D.C.Cir.1997). More particularly, the Court has stated that "a backpay remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices." *Sure–Tan, Inc.*, 467 U.S. at 900, 104 S.Ct. 2803 (emphases in original). Therefore, although a reviewing court must give special respect to the Board's choice of remedy, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct.

1918, 23 L.Ed.2d 547 (1969), we must also be mindful

> not [to] function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.

*Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980).

As we have seen (in Part II.B.1) the Board properly concluded that Capital violated §§ 8(a)(1) and (5) of the Act by setting the initial terms of employment without first bargaining with Local 32. As part of the remedy for this violation the Board ordered Capital

> to restore retroactively preexisting terms and conditions of employment, including wage rates and benefit plans, and make the employees whole by remitting all wages and benefits that would have been paid absent such unilateral changes from May 2, 1992, until [Capital] negotiates in good faith with Local 32B–32J or to impasse.

The Board's rationale for this type of remedy appears in its opinion in *State Distributing Company*:

> [I]t is appropriate to calculate backpay on the basis of the contractual rates paid by the predecessor (in other words, the existing terms and conditions of employment) because the successor's unlawful failure to recognize and bargain with the union has left us without an adequate or reasonable alternative basis for calculating what rates would have been arrived at through lawful bargaining. As noted above in connection with the uncertainties regarding hiring, it is proper to resolve uncertainties against the one whose unlawful acts have created those uncertainties.

> \* \* \* \* \* \*

The remedy the Board has chosen has the drawback of retroactively imposing on the [successor employer] terms and conditions of employment that had been set by the contract negotiated by its predecessor, but it has the advantage of giving some recompense to the victims of the discrimination and preventing the [successor employer] from enjoying a financial position that is quite possibly more advantageous than the one it would occupy had it behaved lawfully. A remedy that allowed to stand the reduced terms and conditions of employment that the [successor employer] imposed unilaterally would give full effect to the right of a *Burns* successor to set its own terms, but this would quite possibly leave victims uncompensated and it would confer *Burns* rights on an employer that has not conducted itself like a lawful *Burns* successor because it has unlawfully blocked the process by which the obligations and rights of such a successor are incurred. A remedy such as the court suggested in [*Kallmann v. NLRB*, 640 F.2d 1094, 1103 (9th Cir.1981) (holding that "an appropriate back pay remedy cannot require Kallmann to pay the higher rate [in the predecessor's CBA] beyond a period allowing for a reasonable time of bargaining" because "Kallmann would not have agreed to union demands to pay the higher rate")] ... is virtually impossible to calculate, and to the extent that it involves imposing contractual terms based on this Agency's conjecture without an adequate factual basis, it seems hardly preferable to imposing on the [successor employer] the terms under which the [predecessor's] employees had worked just before the [successor employer] took over the enterprise.

282 N.L.R.B. 1048, 1049, 1987 WL 90211 (1987).

We disagree with the Board's reasoning and conclude that requiring Capital to reimburse the Ogden employees at the rate set by the CBA between Ogden and Local 32 for the entire period from the violation (May 2, 1992) until such future time as Capital reaches a new agreement or an impasse with Local 32 is punitive rather than remedial. Preliminarily, we reject the Board's implicit assumption that, if Capital had not violated §§ 8(a)(1) and (5) by unilaterally setting the

initial terms of employment, then it would have agreed to the CBA into which its predecessor had entered. Neither the "perfectly clear" exception in *Burns* nor the Board's corollary thereto for cases (such as this) in which the successor discriminates against union adherents requires that the successor agree to the terms of the CBA between the predecessor and the union; nor could they. *See H.K. Porter Co. v. NLRB,* 397 U.S. 99, 102, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970) (Board does not have "power to compel a company ... to agree to any substantive contractual provision" in a CBA). By engaging in anti-union discrimination the successor loses only the right to set initial terms without first bargaining with the union; it does not lose the right to take an initial bargaining position with the union and to bargain hard from that point. *See* 29 U.S.C. § 158(d) (the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession"). As the Ninth Circuit held in *Kallmann:*

> Even though under the facts of this case [the successor employer] had a duty to consult with the union before unilaterally changing the terms of employment, as a successor employer he had no obligation to accept his predecessor's labor agreement.

640 F.2d at 1103; *see also Burns,* 406 U.S. at 284, 92 S.Ct. 1571 ("[A]lthough successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a [CBA] negotiated by their predecessors but not agreed to or assumed by them"); *New Breed Leasing Corp. v. NLRB,* 111 F.3d 1460, 1470 (9th Cir.1997) (O'Scannlain, J., dissenting) ("The [perfectly clear] exception only imposes a duty on the successor to 'consult' with the union before it sets the initial terms and conditions of employment. The duty to consult however does not imply an obligation to accept the old terms of employment"); *U.S. Marine Corp.,* 944 F.2d at 1329 (Easterbrook, J., dissenting) (same).

We conclude that in order to approximate what would have occurred but for Capital's violation of the Act, and thus to avoid penalizing Capital, the Board should have imposed upon Capital the terms of the prior CBA only

for "a period allowing for a reasonable time of bargaining." *Kallmann,* 640 F.2d at 1103. After a reasonable period of bargaining the parties would either have negotiated a new wage rate or reached impasse. No one can know with certainty what wage Capital would have agreed to but the best evidence of the wage it would have had to pay in order to get labor is the rate it (through its subcontractor) actually paid the new employees who did the work previously done by the Ogden employees. A remedy based upon the wage actually paid makes more sense than a remedy based upon the prior CBA wage because there is no reason to believe that Capital would have agreed to paying any more than it had to for labor; the Board's alternative presumption that Capital would have agreed gratuitously to pay the higher CBA rate is unreasonable and, as a result, punitive. *Cf. U.S. Marine Corp.,* 944 F.2d at 1330 (Easterbrook, J., dissenting) ("The Board's rationale is unrelated to the anticipated (or actual) outcome of bargaining"). If the Board nonetheless believes that, owing to some special circumstances, Capital in fact would have agreed in negotiations with the Union to pay a higher rate than it had to pay for alternative labor, then the Board may, of course, put on evidence to prove what the rate would have been.

Contrary to the Board's claim in *State Distributing,* our understanding of the appropriate remedy does not give the wrongdoing employer the right to set initial terms of employment: the remedial wage is still initially—and for the reasonable period during which the employer should have bargained with the union—the rate in its predecessor's CBA. We simply observe that in order realistically to approximate what would have happened absent discrimination the Board must take account of what actually did happen. Doing so focuses the Board's efforts upon the only proper remedial goal, namely, placing the employees in the situation they would have enjoyed but for Capital's having unlawfully refused to hire them.

We recognize that our view of the limitation § 10(c) places upon the remedial authority of the Board in this type of case conflicts with that of several other circuits. *See New Breed Leasing Corp. v. NLRB,* 111 F.3d

1460, 1467–69 (9th Cir.1997); *NLRB v. Staten Island Hotel Ltd. Partnership,* 101 F.3d 858, 861–62 (2d Cir.1996); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1319–24 (7th Cir. 1991) (en banc); *see also Pace Indus., Inc. v. NLRB,* 118 F.3d 585, 593–94 (8th Cir.1997) (brief discussion); *NLRB v. Horizons Hotel Corp.,* 49 F.3d 795, 806 (1st Cir.1995) (same); *Systems Management, Inc. v. NLRB,* 901 F.2d 297, 307–09 (3d Cir.1990) (granting enforcement of remedial order but suggesting that Board might limit term of back-pay to time for bargaining to impasse). Other courts, however, have taken an approach similar to ours. *See Armco, Inc. v. NLRB,* 832 F.2d 357, 365 (6th Cir.1987); *Kallmann v. NLRB,* 640 F.2d 1094, 1103 (9th Cir.1981); *NLRB v. Dent,* 534 F.2d 844, 846–47 (9th Cir.1976); *see also New Breed Leasing,* 111 F.3d at 1469–72 (O'Scannlain, J., dissenting); *U.S. Marine,* 944 F.2d at 1327–31 (Easterbrook, J., dissenting). As we see it, the alternative adopted by the Board conflicts with two cardinal principles of labor law: (1) an employer cannot be required to accept contractual terms to which it did not agree, and (2) the Board's remedial order must be just that—remedial—and not punitive.

### III. Conclusion

We hold that (1) there is substantial evidence in the record supporting the Board's determination that Capital violated §§ 8(a)(1) and (3) of the Act by refusing to hire the Ogden employees based upon their union membership; (2) as a successor employer, Capital violated §§ 8(a)(1) and (5) of the Act by refusing to recognize and bargain with Local 32; and (3) Capital again violated §§ 8(a)(1) and (5) by setting initial terms and conditions of employment before negotiating with Local 32. We also hold that (4) the Board's remedy—imposing upon Capital the terms of its predecessor's CBA from the date of the violation until the conclusion of future negotiations—is punitive and therefore invalid. We therefore remand the case to the Board for further proceedings consistent with this opinion.

*So ordered.*