**WATERBURY HOTEL MANAGE-MENT, LLC and Waterbury Hotel Equity, LLC, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 01–1403.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 18, 2002.

Decided Jan. 14, 2003.

Scott V. Kamins argued the cause for petitioner. With him on the briefs were Jay P. Krupin and D. Jay Sumner. Alison N. Davis entered an appearance.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell Jr., Supervisory Attorney.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The purchaser of a unionized hotel petitions for review of the National Labor Relations Board's finding that it committed unfair labor practices in an effort to prevent further union activity at the hotel. Finding the Board's determinations consistent with the National Labor Relations Act and supported by substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement.

## I.

The Waterbury Sheraton Hotel was first opened in the mid–1980s by owners Joseph and Loretta Calabrese. The Calabreses also owned a hotel management company, JLM, Inc., which ran the hotel under a lease with the Calabreses. In 1995, Local 217, Hotel and Restaurant Employees and Bartenders Union, AFL–CIO, was certified as the bargaining representative of the hotel's service, front desk, restaurant, and maintenance employees.

When the Calabreses declared personal bankruptcy in 1994, Prudential Insurance Company, which held a mortgage on the hotel property, began foreclosure proceedings. JLM continued to operate the hotel for a short period, but it too filed for bankruptcy, and the bankruptcy court appointed a trustee who took over day-to-day operations of the hotel. In the meantime, Prudential solicited and ultimately secured a purchase offer from New Castle, LLC, a company that owns, operates, and develops hotels and resorts throughout the United States and Canada. New Castle acquired the facility, then operating as a mid-market Sheraton Four Points hotel, with the intention of converting it to a more upscale, four-star operation. To run the hotel, New Castle set up two subsidiaries, Respondents Waterbury Hotel Equity and Waterbury Hotel Management, to which we shall refer as "Waterbury."

Although the purchase and sale agreement, signed in November 1996, provided that Waterbury would "have no obligation

to hire any of the employees currently employed at the Hotel property," New Castle President David Buffam and other company representatives repeatedly assured the trustee that Waterbury would interview current hotel employees. When the trustee organized an on-site job fair at which potential employers could interview the hotel's employees, however, Waterbury refused to participate.

As it turned out, Waterbury had plans for its own job fair, which it conducted over three days in late January. At the fair, applicants were first interviewed by "screeners," who would either reject them or pass them on for first, and perhaps second, substantive interviews. In the end, Waterbury hired 65 employees for positions within the bargaining unit, 20 of whom had worked for the old hotel. The company interviewed and rejected 62 other incumbent employees, including all members of the Union's negotiating committee. Among those hired were three Yale undergraduates and one recent graduate whom, unbeknownst to Waterbury, the Union had asked to apply for jobs. Waterbury later fired two of the undergraduates for wearing union buttons in violation of the hotel's dress code. One week later, it fired the recent graduate for job abandonment.

The Union filed unfair labor practice charges, alleging that Waterbury violated sections 8(a)(1), (a)(3), and (a)(5) of the National Labor Relations Act by discriminatorily refusing to hire incumbent hotel employees, unilaterally setting initial terms and conditions of employment without bargaining with the Union, and discharging the three Yale students because they supported the Union. *See* 29 U.S.C. § 158(a)(1), (a)(3), (a)(5). After a hearing, the Administrative Law Judge found in favor of the Union. The Board adopted the ALJ's findings and conclusions, as well as his recommended order. *Waterbury*

*Hotel Mgmt. LLC,* 333 N.L.R.B. No. 60, 2001 WL 252753, 2001 NLRB LEXIS 136 (Mar. 9, 2001). Waterbury petitions for review, and the Board cross-applies for enforcement.

## II.

■ As we often observe, our role in reviewing decisions of the National Labor Relations Board is limited. We will set aside the Board's decision only if the Board "acted arbitrarily or otherwise erred in applying established law to the facts at issue, or if its findings are not supported by substantial evidence." *Plumbers & Pipe Fitters Local Union No. 32 v. NLRB,* 50 F.3d 29, 32 (D.C.Cir.1995) (internal quotation marks and citations omitted). With this highly deferential standard of review in mind, we consider each of Waterbury's challenges to the Board's decision.

### ALJ Bias

■ We begin with the company's claim that the ALJ deprived it of a fair hearing. According to Waterbury, the ALJ, who had presided over a previous hearing concerning the hotel, at which he found that the Calabreses' management company had committed unfair labor practices, *J.L.M., Inc.,* 312 N.L.R.B. 304, 1993 WL 379853 (1993), *enforced in part,* 31 F.3d 79 (2d Cir.1994), erred by not disclosing this source of potential bias. But if, as the Supreme Court has held, an ALJ is not disqualified from presiding over the remand of a case in which he previously ruled against the same employer, *NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 236–37, 67 S.Ct. 756, 765–66, 91 L.Ed. 854 (1947), then New Castle could not have obtained the ALJ's disqualification simply because he had ruled against a different employer, Waterbury's predecessor, in an unrelated case.

Waterbury next claims that the ALJ's bias is evident in his decision to adopt the Board's post-hearing brief more or less verbatim. Although we have held that wholesale cutting and pasting from proposed findings and conclusions warrants particularly close scrutiny, *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1407–08 & n. 3 (D.C.Cir.1988) (per curiam), we have never held, as Waterbury insists, that this practice alone demonstrates impermissible bias, *id.*; *see also Anderson v. Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."). In this case, we are satisfied that the Board, recognizing that the ALJ had made extensive use of the General Counsel's brief, gave the ALJ's findings the appropriate scrutiny: It "independently reviewed the entire record, including the judge's decision, in consideration of the exceptions and briefs." *Waterbury Hotel Mgmt.*, .333 N.L.R.B. No. 60, 2001 WL 252753, at *1, 2001 NLRB LEXIS 136, at *6.

Finally, Waterbury detects bias in the ALJ's decisions to disallow or ignore evidence tending to rebut the Board's case. In each instance Waterbury cites, however, the ALJ actually admitted the evidence, but determined—reasonably, we believe—either to discredit the evidence or that it was entitled to little weight. Such adverse rulings alone hardly demonstrate "that the ALJ had a fixed opinion—a closed mind on the merits of the case." *Pharaon v. Bd. of Governors of the Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C.Cir. 1998) (internal quotation marks and citations omitted).

## Unlawful Hiring Practices

NLRA section 8(a)(3) makes it an unfair labor practice for an employer to discriminate in hiring or in other employment decisions in order to encourage or discourage membership in a labor union. 29 U.S.C. § 158(a)(3). This prohibition of discriminatory hiring extends to employers that take over another business. Although under no obligation to hire predecessor employees, such employers may not lawfully refuse to hire them because of their union affiliation. *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees*, 417 U.S. 249, 262 & n. 8, 94 S.Ct. 2236, 2243 & n. 8, 41 L.Ed.2d 46 (1974); *accord Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1005 (D.C.Cir.1998).

To establish a section 8(a)(3) violation, the Board must first determine "whether the employer's actions are motivated by anti-union considerations." *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 955 (D.C.Cir.1988) (internal quotation marks and citation omitted). The Board may rely on both direct and circumstantial evidence in resolving this question of fact. *Id.*; *Elastic Stop Nut Div. of Harvard Indus. v. NLRB*, 921 F.2d 1275, 1280 (D.C.Cir.1990). Once the General Counsel has established that the employer was in fact motivated by anti-union animus, the Board must find a violation of the Act unless the employer can show that "it would have taken the [same] action regardless of the existence of such animus." *Elastic Stop Nut*, 921 F.2d at 1280; *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 403–04, 103 S.Ct. 2469, 2475–76, 76 L.Ed.2d 667 (1983), *aff'g Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981).

The record in this case contains substantial, unrebutted evidence that Wa-

terbury's hiring decisions were motivated by anti-union animus. The trustee, whom the ALJ credited, testified that New Castle President David Buffam, explaining why the company refused to participate in the trustee's job fair, said that "he had received advice of counsel and ... needed to be concerned about who he hired and how he hired"; that "there were certain hiring parameters that he couldn't exceed"; and that "they could have labor issues down the road." *Waterbury Hotel Mgmt.*, 333 N.L.R.B. No. 60, 2001 WL 252753, at *17, 2001 NLRB LEXIS 136, at *53–*54. When a former employee was brought on as a temporary worker because of the hotel's pressing need for banquet employees, but then denied permanent employment, the acting banquet manager explained, "I'm sorry, but we were told not to hire any of the old people back." *Id.* at *59, 2001 NLRB LEXIS 136, at *182. And when asked by one of the Yale students if there was a union at the hotel, the accounting director responded, "No, there is no union here, the word 'union' has been wiped clear of this place." *Id.* at *91, 2001 NLRB LEXIS 136, at *276. From these and similar statements in the record, the ALJ could have properly inferred that the company's hiring decisions were motivated by anti-union animus. *See, e.g., Capital Cleaning Contractors*, 147 F.3d at 1005 (upholding finding of anti-union animus based on company vice-president's statements that he did not want to hire union members); *Elastic Stop Nut*, 921 F.2d at 1281 (statements that employer would hire no more than 25 percent of predecessor's work force).

Substantial evidence also supports the Board's conclusion that Waterbury was determined not to hire enough incumbent employees to trigger a bargaining obligation. To begin with, record evidence indicates that Waterbury's hiring procedures departed from its usual practice.

Normally when New Castle purchased a hotel, it interviewed the existing workforce while the hotel was still operating. In this case, the company refused to participate in the trustee's job fair for former employees, instead conducting its own fair after the predecessor hotel had closed. *Cf. Southwire Co. v. NLRB*, 820 F.2d 453, 460, 463 (D.C.Cir.1987) (departing from usual practice can be evidence of anti-union motive). Record evidence also indicates that Waterbury conducted the job fair in a manner that put incumbent employees at a disadvantage. The ALJ found that the human resources director, in preparation for the job fair, winnowed Waterbury's list of post-screening interview questions down to a few highly general, abstract questions, excluding all inquiries relating to interviewees' experience. As the ALJ saw it, this refusal to credit job experience reflected a desire to avoid hiring incumbent, union employees. We think this sufficient to establish a prima facie case that Waterbury's hiring decisions were motivated by anti-union considerations.

■ Waterbury argues that even if it did act with anti-union animus, such animus was not a but-for cause of its hiring decisions. According to Waterbury, it had legitimate reasons for not considering incumbent employees' job experience, given that they gained that experience while working for an operation that ultimately fell into bankruptcy. But Waterbury points to no evidence showing that any incumbent employees were in any way responsible for the decline and fall of the Calabreses' hotel. Quite to the contrary, in a proposal seeking financing for its new hotel, the company attributed the predecessor hotel's failure not to the employees, but to the "regional and national recession" and to the "lack of experienced and efficient management." *Cf. Capital Cleaning Contractors*, 147 F.3d at 1007 (reject-

ing an affirmative defense based on clients' dissatisfaction with employees' performance where there was no evidence that the client had singled out any individual employees).

■ Waterbury contends that it would have refused to hire incumbent employees *no matter their union affiliation* because they failed to satisfy the neutral hiring criteria used at the job fair. Record evidence shows, however, that the company applied its neutral criteria inconsistently. For example, Waterbury rejected incumbent employees on the basis of "incompatible hours" because they were in school, yet hired the two Yale students, as well as other newcomers also attending school. Waterbury also rejected incumbent employees on the basis of "pay not acceptable" because they said they expected $6.25 or $6.50 per hour for what was, unbeknownst to them, a $6.00 per hour housekeeping job, yet hired nonincumbents who asked for $7.00 per hour. The record is full of similar inconsistencies. Substantial evidence thus supports the Board's conclusion that the hiring criteria served as little more than pretext for weeding out incumbent, union employees. *See United Food & Commercial Workers Int'l Union v. NLRB*, 768 F.2d 1463, 1475 (D.C.Cir.1985) (discrediting employer's argument that neutral hiring criteria were implemented for legitimate business purposes where they were disproportionately applied against union employees).

*Successorship*

■ Waterbury next contends that it did not violate the NLRA by unilaterally setting initial employment conditions for its employees without first bargaining with the Union. Although NLRA section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of [its] employees," 29 U.S.C. § 158(a)(5), a new employer generally assumes an obligation to bargain with the representative of its predecessor's employees only if the new employer is considered a "successor" to the old—that is, if it (1) conducts essentially the same business as its predecessor, and (2) hires a "substantial and representative complement" of the predecessor's work force, and a majority of the new work force had been employees of the predecessor. *Capital Cleaning Contractors*, 147 F.3d at 1005, 1007; *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 107 S.Ct. 2225, 2234–35, 96 L.Ed.2d 22 (1987). Waterbury contends that it fits neither of these two criteria.

■ Whether a new employer is a successor to the old is a fact-intensive inquiry requiring consideration of whether, in view of "the totality of the circumstances," there is "substantial continuity" between the new and predecessor employers. *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 937 (D.C.Cir.1998). Factors affecting the determination of whether such continuity exists include "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River*, 482 U.S. at 43, 107 S.Ct. at 2236. Because the NLRA's purpose is to "further industrial peace," including avoiding the labor unrest that might result if employees' "legitimate expectations in continued representation by their union are thwarted," the central question the Board must consider is "whether those employees who have been retained will understandably view their job situations as essentially unaltered." *Id.* at 39, 43, 107 S.Ct. at

2233–34, 2236 (internal quotation marks and citation omitted).

Pointing out that the Supreme Court has also said that the substantial continuity test directs the Board to focus on "whether the new company has 'acquired substantial assets of its predecessor,'" *id.* (quoting *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973)), Waterbury argues that it cannot be a successor because, although it acquired the Calabreses' hotel from Prudential, it did not acquire the substantial assets of JLM, the Calabreses' hotel management company, which employed the hotel's management team and employees. We disagree. While the Supreme Court has certainly said that acquisition of the predecessor's assets may be evidence of substantial continuity in business operations, as in *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973), it has never held that transfer of assets is either a necessary or a sufficient condition for that finding. The core inquiry in the successorship analysis, after all, is not whether assets have been transferred, but whether employees may legitimately expect the change in control to affect their continued union representation. We thus hold, as have all of our sister circuits to have squarely considered the issue, that the acquisition of substantial assets is not a prerequisite for successorship. *See Saks & Co. v. NLRB,* 634 F.2d 681, 687 (2d Cir.1980) ("[W]hile a transfer of assets may be evidence of the requisite continuity of business operations, it has not been thought to be a necessary condition. . . ."); *see also NLRB v. Houston Bldg. Serv., Inc.,* 936 F.2d 178, 180–81 & n. 2 (5th Cir.1991) ("Transfer of ownership of assets . . . is only one factor we consider."); *Tom-A-Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1027–28 (7th Cir.1969) ("The duty of an employer who has taken over an 'employing industry' to honor the employees' choice of bargaining agent is not one that . . . necessarily turns upon the acquisition of assets.") (quoting *Maintenance, Inc.,* 148 N.L.R.B. 1299, 1301, 1964 WL 16169 (1964)).

Considering the "totality of the circumstances," moreover, we find in the record sufficient evidence of continuity of business operations to support the Board's successorship determination. Although it never acquired the assets of JLM, the legal entity that ran the hotel, Waterbury did acquire the assets—the hotel property, fixtures, and equipment—of JLM's sole owners. Waterbury provides the same type of service as its predecessor, and it does not dispute that employees at the new hotel continue performing largely the same set of jobs that they had performed before Waterbury came on the scene.

Further objecting to the Board's successorship finding, Waterbury points to extensive renovations and policy changes it made in an effort to transform the facility into a more upscale hotel targeted at "higher-caliber" customers. Petitioners' Br. at 24. According to Waterbury, this attempt to upgrade the quality of service marks a fundamental break from the prior business. Record evidence, however, reveals that for at least two years, Waterbury continued operating the hotel as a mid-market Four Points hotel, rather than an upscale Sheraton. And even though in its effort to enhance the quality of hotel service, Waterbury changed a substantial complement of the hotel managers, corporate policies, and sales and service contracts, we believe the Board reasonably determined that these changes were not "essential changes" likely to affect employee attitudes about union representation. *See Clarion Hotel–Marin,* 279 N.L.R.B. 481, 1986 WL 53888 (1986) (finding that a

hotel's conversion from a Holiday Inn to a Clarion Hotel, with attendant changes to conform with Clarion standards, was not an "essential change" that would affect employee attitudes about representation); *cf. Harter,* 133 F.3d at 938 ("We ask not whether [the employer's] view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is reasonably defensible.") (internal quotation marks and citation omitted).

▮ Next, Waterbury argues that even if the record contains substantial evidence of continuity of business operations, it remained free to set initial terms and conditions of employment because a majority of its employees never worked for its predecessor. *See NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 281–82, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972) (successors are generally free to set initial terms and conditions of employment). But where, as here, a successor refuses to hire predecessor employees because of anti-union animus, the Board presumes that but for such discrimination, the successor would have hired a majority of incumbent employees. *Capital Cleaning Contractors,* 147 F.3d at 1008. In other words, "when a successor refuses to hire its predecessor's employees based upon antiunion animus, the successor loses the right unilaterally to set the initial terms and conditions of employment." *Id.* Although Waterbury thinks this rule is "unreasonable and arbitrary," Petitioners' Br. at 42, both this and every other circuit to have considered the issue have approved it. *See Capital Cleaning Contractors,* 147 F.3d at 1008.

## Employee Discharges

▮ Finally, Waterbury challenges the Board's finding that it violated NLRA section 8(a)(3), which makes it an unfair labor practice for an employer to dismiss em-ployees for engaging in protected union activities, 29 U.S.C. § 158(a)(3), when it dismissed the three Yale students—Joann Lo, Francis Engler, and Jonathan Zerolnick.

▮ Waterbury fired Lo and Engler for wearing union buttons in violation of the hotel's general prohibition against wearing unauthorized pins and badges. Although the NLRA generally protects employees' right to wear union buttons or other insignia, *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 801–03 & n. 7, 65 S.Ct. 982, 987–88 & n. 7, 89 L.Ed. 1372 (1945); *accord Pioneer Hotel, Inc. v. NLRB,* 182 F.3d 939, 946 (D.C.Cir.1999), employers may enforce rules that have the effect of interfering with such protected activities under "special circumstances." *Pioneer Hotel,* 182 F.3d at 946. Citing *Burger King Corp. v. NLRB,* 725 F.2d 1053, 1054–55 (6th Cir.1984), in which the Sixth Circuit held that "where an employer enforces a policy that its employees may only wear authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have contact with the public, a 'special circumstance' exists as a matter of law which justifies the banning of union buttons," Waterbury argues that similar circumstances justified its dress code because its employees deal with the public. Petitioners' Br. at 42–43.

We need not consider the validity of Waterbury's across-the-board no-buttons policy, however, for the record contains substantial evidence that the company did not apply the policy across the board. Both Lo and Engler testified that they had worn unauthorized shamrock buttons in plain view of hotel managers, and that the managers, perhaps swept up in the St. Patrick's Day spirit, said not a word to them. In contrast, when the two appeared at work wearing unauthorized union buttons, both were promptly reprimanded and

dismissed. Even if, as some courts have held, dress codes such as Waterbury's might be valid, selective enforcement to banish only pro-union buttons and insignia from the workplace is certainly not. *See Burger King*, 725 F.2d at 1054–55 (6th Cir.1984) (an employer may enforce a no-buttons policy for employees who have contact with the public if it does so "in a consistent and nondiscriminatory fashion").

■ One week after dismissing Lo and Engler, Waterbury also fired their roommate, Jonathan Zerolnick, the recent Yale graduate. Whether Waterbury fired Zerolnick for abandoning his job, as the company claims, or for associating with union supporters, as the Board found, is a close call. The record certainly contains some evidence to support Waterbury's claim that it fired Zerolnick for job abandonment. After being told that he could take a temporary leave of absence and that he should contact his supervisor when ready to return, he made no contact with anyone at the hotel for several weeks. Our job, however, is to determine whether the Board's view of the facts, not the employer's, is supported by substantial evidence.

*See Harter*, 133 F.3d at 938. In light of record evidence indicating that Waterbury granted Zerolnick the leave of absence without setting firm dates for his return to work or for contacting the hotel, that no one from Waterbury contacted him before sending the termination letter, and that Waterbury sent the letter just one week after discovering his roommates' union affiliation, we think the Board had a sufficient basis for concluding that Waterbury fired Zerolnick because of his association with union supporters.

### III.

Having considered Waterbury's remaining arguments and found them to be without merit, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*