# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 4, 2016       Decided September 13, 2016

No. 14-1135

———

CONSOLIDATED COMMUNICATIONS, INC., DOING BUSINESS AS
ILLINOIS CONSOLIDATED TELEPHONE COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO, LOCAL 702,
INTERVENOR

———

Consolidated with 14-1140

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Robert T. Dumbacher* argued the cause for petitioner. With him on the briefs were *Kurt G. Larkin*, *David C. Lonergan*, and *Amber M. Rogers*.

*Joel A. Heller*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

*Christopher N. Grant* argued the cause and filed the brief for intervenor.

Before: TATEL, BROWN, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Concurring opinion filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: After collective-bargaining negotiations soured between Consolidated Communications, Inc. ("Consolidated") and the International Brotherhood of Electrical Workers, AFL-CIO, Local 702 ("Union"), Union members launched a strike at several company facilities. After the dust settled and the strikers returned to work, Consolidated disciplined several employees for alleged misconduct during the strike and eliminated a workplace position held by a union worker. The National Labor Relations Board found that both Consolidated's disciplinary actions and its unilateral elimination of a bargaining-unit position violated the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (5). Consolidated now petitions for review of the Board's decision, while the Board cross-petitions for enforcement of its order.

We enforce the portions of the Board's order determining that Consolidated's suspensions of Michael Maxwell and Eric Williamson, as well as the company's elimination of the bargaining-unit position, violated the Act. However, we grant

Consolidated's petition for review and deny cross-enforcement for that portion of the order addressing Consolidated's discharge of Patricia Hudson, and remand because the Board applied an erroneous legal standard in evaluating Hudson's strike misconduct.

**I**

Consolidated is a telecommunications company that provides commercial and residential telephone, television, and broadband services. The company maintains numerous facilities in Illinois, including a garage in Taylorville and a general warehouse known as the Rutledge Building on 17th Street in Mattoon. Consolidated's corporate headquarters is also in Mattoon.

The Union represents a unit of employees at Consolidated's Taylorville and Mattoon facilities whose work was covered by a collective-bargaining agreement that expired in November 2012. Numerous bargaining sessions for a new contract failed, and negotiations between Consolidated and the Union stalled. Union members then began a strike on December 6, 2012. Employees picketed at several company locations, including the Taylorville garage, the Rutledge Building, and the Mattoon corporate headquarters. The Union informed the strikers that they could also picket at any commercial sites where Consolidated employees were performing work, a practice known as "ambulatory picketing." J.A. 183.

During the strike, Consolidated continued to operate through the use of replacement workers, out-of-state employees, and managers. Consolidated hired the Huffmaster Security Company to guard the facilities, direct traffic across picket lines, and advise non-striking employees about how to conduct themselves during the strike. Non-striking

employees were instructed to be "extremely cautious in their dealing with strikers to ensure everyone's safety" and to "[r]eport any incidents to the Command Center." J.A. 59.

The strike lasted almost a week, with the strikers returning to work on December 13, 2012. In the course of the strike, Consolidated received written and verbal reports of six specific incidents of alleged misconduct by strikers Michael Maxwell, Patricia Hudson, Brenda Weaver, and Eric Williamson. After meeting individually with each employee, Consolidated suspended all four employees indefinitely without pay pending investigation of the allegations. Several days later, Consolidated confirmed two-day suspensions for Maxwell and Williamson and discharged Hudson and Weaver.

In early 2013, Consolidated decided to fill Hudson's job as an Office Specialist in the Fleet Department, but not Weaver's former position of Office Specialist in the Facilities Department. Consolidated assigned the Fleet Department job, as well as some of Weaver's former duties, to another bargaining-unit employee. Consolidated did not notify or bargain with the Union in advance of those decisions. Upon learning of them, the Union immediately objected and demanded a return to the status quo and the opportunity to bargain over the changes. In April, Consolidated informed the Union that it was transferring some of Weaver's former duties outside of the bargaining unit.

The Union filed unfair labor practice charges against Consolidated objecting to both the disciplinary actions and the unilateral elimination of a bargaining-unit position. The General Counsel for the Board subsequently issued a complaint alleging that Consolidated violated Sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) & (1), by

discharging Hudson and Weaver and suspending Maxwell and Williamson for alleged misconduct that the General Counsel alleged either did not occur or was insufficiently egregious to warrant such discipline. The complaint also alleged that Consolidated violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) & (1), by eliminating a bargaining-unit position without notifying or bargaining with the Union.

The case was heard by a National Labor Relations Board Administrative Law Judge, who found that Consolidated acted unlawfully in disciplining Hudson, Weaver, Maxwell, and Williamson. The ALJ declined to rule on the Section 8(a)(5) claim pertaining to the eliminated unit position.

In July 2014, the Board affirmed the ALJ's rulings, findings, and conclusions. The Board also concluded that Consolidated violated Section 8(a)(5) by reassigning and eliminating the job duties of the Office Specialist-Facilities position without notice of bargaining.[1]

## II

On review, the Board's factual findings and application of law to those facts must be sustained if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). While our review is deferential, we will not "rubber-stamp NLRB decisions," and we "examine carefully both the Board's findings and its reasoning." *Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 21 (D.C. Cir. 2012) (internal citations and quotation marks omitted). "[W]e

---

[1] The Union and Consolidated separately settled their dispute over Weaver's termination, so Consolidated does not seek review of that aspect of the Board's decision.

do not reverse the Board's adoption of an ALJ's credibility determinations unless * * * those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998) (quoting *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998)).

Sections 8(a)(3) and (1) of the Act prohibit an employer from interfering with, restraining, coercing, or discriminating against employees in the exercise of their statutory rights to, among other things, join together in collective action and strike. 29 U.S.C. §§ 158(a)(3) & (1). Under the Act, an employer ordinarily must reinstate striking employees at the conclusion of a strike. *See National Conference of Firemen and Oilers, SEIU v. NLRB*, 145 F.3d 380, 384 (D.C. Cir. 1998); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378–379 (1967). However, "serious misconduct by strikers is not protected by the Act," and an employer's imposition of "reasonable discipline, including the refusal to reinstate employees for such misconduct, does not constitute an unfair labor practice." *National Conference of Firemen and Oilers*, 145 F.3d at 384.

An employer's discipline of an employee for strike conduct constitutes an unfair labor practice if (i) "the discharged employee was at the time" of the alleged misconduct "engaged in a protected activity," (ii) the employer knew the employee was engaged in a protected activity, (iii) the alleged misconduct during that protected activity provided the basis for discipline, and (iv) the "employee was not, in fact, guilty of that misconduct." *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964).

Not all misconduct is sufficient to disqualify a striker from the Act's protection, however. *See Allied Indus. Workers, AFL-CIO Local Union No. 289 v. NLRB*, 476 F.2d 868, 879 (D.C. Cir. 1973) ("[N]ot every incident occurring on the picket line, though harmful to a totally innocent employer, justifies refusal to reemploy a picketing employee for acts that exceed the bounds of routine picketing.") (quoting *Montgomery Ward & Co. v. NLRB*, 374 F.2d 606, 608 (10th Cir. 1967)); *Coronet Casuals*, 207 NLRB 304, 304 (1973) ("[N]ot every impropriety committed in the course of a strike deprives an employee of the protective mantle of the Act."). Indeed, this court has previously noted that "[c]learly some types of impulsive behavior must have been within the contemplation of Congress when it provided for the right to strike." *Allied Indus. Workers*, 476 F.2d at 879.

Consequently, "the employees' right to organize and bargain collectively" must be balanced "against the employer's right to maintain order and respect and the public's right to safety." *Allied Indus. Workers*, 476 F.2d at 879. Striker misconduct justifies an employer's disciplinary action if, "'under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act,'" including the right to refrain from striking. *Clear Pine Mouldings*, 268 NLRB 1044, 1046 (1984), *enf'd*, 765 F.2d 148 (9th Cir. 1985), *cert. denied*, 474 U.S. 1105 (1986) (quoting *NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519, 528 (3d Cir. 1977)). As the Board explained in *Clear Pine Mouldings*,

> the existence of a "strike" in which some employees elect to voluntarily withhold their services does not in any way privilege those employees to engage in other than peaceful picketing and persuasion. They have no right, for example, to threaten those

employees who, for whatever reason, have decided to work during the strike, to block access to the employer's premises, and certainly no right to carry or use weapons or other objects of intimidation. As we view the statute, the only activity the statute privileges in this context, other than peaceful patrolling, is the nonthreatening expression of opinion, verbally or through signs and pamphleteering * * *.

268 NLRB at 1047.

"The *Clear Pine* standard is an objective one" and "does not call for an inquiry into whether any particular employee was actually coerced or intimidated." *Mohawk Liqueur Co.*, 300 NLRB 1075, 1075 (1990). Rather, "'[a] serious threat may draw its credibility from the surrounding circumstances and not from the physical gestures of the speaker,'" and an employer need not "'countenance conduct that amounts to intimidation and threats of bodily harm.'" *Clear Pine Mouldings*, 268 NLRB at 1046 (quoting *Associated Grocers of New England v. NLRB*, 562 F.2d 1333, 1336 (1st Cir. 1977), and *W. C. McQuaide, Inc.*, 552 F.2d at 527).

The striker-misconduct standard thus offers misbehaving employees greater protection from disciplinary action than they would enjoy in the normal course of employment. *See Midwest Regional Joint Board v. NLRB*, 564 F.2d 434, 440 (D.C. Cir. 1977) ("Absent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason or no reason at all without running afoul of the labor laws.").

There is a "burden-shifting element to the *Burnup & Sims* test" for determining whether employer discipline of a striker amounts to an unfair labor practice. *Shamrock Foods Co. v.*

*NLRB*, 346 F.3d 1130, 1134 (D.C. Cir. 2003). The General Counsel must initially establish that the disciplined employee was a striker and that the employer took action against him or her for conduct associated with the strike. *See In re Detroit Newspaper Agency*, 340 NLRB 1019, 1024 (2003). The burden then shifts to the employer to demonstrate an honest belief that the disciplined employee engaged in misconduct. *See id.*; *Shamrock Foods Co.*, 346 F.3d at 1134. Upon that showing, the burden shifts back to the General Counsel to show that the misconduct did not occur or that it was not serious enough to forfeit the protection of the National Labor Relations Act and to warrant the discipline imposed. *See Shamrock Foods Co.*, 346 F.3d at 1134; *In re Detroit Newspaper Agency*, 340 NLRB at 1024; *Burnup & Sims*, 379 U.S. at 23 n.3. It is the "General Counsel's obligation to carry the ultimate burden of proving that illegal discrimination has occurred," and "[t]o the extent that there is a lack of evidence" on either the absence of misconduct or the improper response of the employer, the dispute "must be resolved in favor of the employer." *Axelson, Inc.*, 285 NLRB 862, 864 (1987); *see also Shamrock Foods Co.*, 346 F.3d at 1135 (The "General Counsel has the burden of showing that the employee did not, in fact, commit the misconduct.") (internal quotation marks and citation omitted).

## III

### A. Maxwell

Michael Maxwell is a janitor at Consolidated. On the morning of December 8, 2012, he and several other bargaining-unit employees picketed Consolidated's Taylorville garage, walking back and forth across the driveway entrance to the parking lot.

That morning, strike-replacement workers Leon Flood and Frank Fetchak left the parking garage in a company van with Flood driving and Fetchak in the passenger seat.  As the van approached the exit, Maxwell and others in the picket line blocked the van from leaving.  Flood stopped the van briefly and then began inching slowly forward towards the picketers.  Maxwell continued to walk back and forth in front of the van between the headlights.

At some point, Maxwell's elbow or forearm made contact with the hood of the van.  According to an email and incident reports written by Flood, Maxwell intentionally blocked the path of the van and leaned on the hood.  Maxwell, however, testified that the van never stopped, but instead "[a]ll of a sudden took off" and hit him, causing him to bend in towards the van and brace himself against the hood with his arm.  J.A. 341.  Flood's passenger Fetchak testified that Maxwell "laid on the van," *id.* at 572, or "lean[ed] on the hood" for "less than a minute," *id.* at 575.  Maxwell then moved around to the driver's side of the van.  Maxwell claimed to have been scrambling to get out of Flood's way, but then the van moved forward and hit him again, pushing him to the driver's side.  He gave Flood the middle finger and uttered its associated obscenity.  *Id.* at 342; *see also id.* at 29, 574.  Maxwell testified that he sustained a "slight yellowish bruise" on his right hip as a result of the incident.  *Id.* at 346.

Consolidated informed Maxwell about "reports of [his] harassing, threatening, [and] intimidating behavior towards other [Consolidated] employees," J.A. 30, and suspended him for violating the company's "handbook/workplace violence policy," which prohibits "any acts or threats of violence," *id.* at 22–23.  *See also id.* at 30 ("You struck the vehicle, proceeded to the front of the vehicle and leaned on the hood for an extended period of time impeding [Flood's] progress,

and then proceeded around the vehicle to the driver's window and verbally harassed him.").

Adopting the ALJ's factual findings, the Board concluded that Maxwell "did not intentionally strike Leon Flood's vehicle and did not threaten or intimidate Leon Flood." J.A. 12. Instead, the Board determined that Flood hit Maxwell with the van, causing Maxwell to fall forward and brace himself by placing his forearm on the hood. While Maxwell "briefly impeded Flood's progress in leaving the [Taylorville] garage," "he did so no more than the other five picketers" at the scene. *Id*. at 4.

In reaching those findings, the ALJ credited Maxwell's account, rather than Flood's written report (Flood did not testify at the hearing), reasoning that the testimony of Fetchak did not contradict Maxwell "in any material way." J.A. 4 n.5. Consolidated argues that finding was erroneous because Fetchak and Maxwell gave disparate testimony on several key points. For example, Maxwell claimed the van "[t]ook off like a bat out of hell," *id.* at 340, whereas Fetchak testified that Flood was forced to stop the van close to the picket line and to inch slowly forward. Consolidated also notes that Fetchak testified that Maxwell put his arm on the hood and leaned against the van, while Maxwell claimed that the van hit him twice and that he was merely bracing himself.

Those distinctions, however, are not so material as to make the fact findings clearly erroneous. Maxwell's "bat out of hell" comment refers to the vehicle's movement from when Maxwell first saw the van, "coming out of the building," not at the moment when he claims to have been hit. J.A. 340. While Maxwell maintained that the van never stopped, he did concede that the van was "going slower" when it allegedly hit him. *Id.* at 351–352. As for Maxwell's contact with the van,

Fetchak acknowledged that "the reason [Maxwell] leaned his elbow on the van could have been because he was hit by the van on his hip." *Id.* at 587 (conceding that this "could be an explanation" for the contact).

Importantly, both Fetchak and Maxwell indicated that Maxwell's encounter with the van was fleeting, not for "an extended period of time," J.A. 30, as Consolidated alleges. *See id.* at 575 (Fetchak testifying that Maxwell leaned on the hood "15 seconds or so. * * * It was less than a minute."); *id.* at 343 (Maxwell testifying it was "a minute at the most" from when he first saw Flood to when Flood pulled out of the driveway). There is also no evidence whatsoever that Maxwell ever "struck" the van; in fact, Fetchak's testimony indicates otherwise. *See id.* at 580 (testifying that he did not see Maxwell raise his arm to strike the van); *id.* at 586 ("[Maxwell] didn't hit the van. * * * I don't think he struck it. * * * The definition of strike is making a striking motion, no, I don't believe he did that."). Thus, it was not "hopelessly incredible, self-contradictory, or patently unsupportable," *Cadbury Beverages*, 160 F.3d at 28 (internal quotation marks omitted), for the ALJ to credit Maxwell's account and find that Flood hit him. *See also E.N. Bisso & Sons, Inc. v. NLRB*, 84 F.3d 1443, 1444–1445 (D.C. Cir. 1996) ("[C]redibility determinations may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its fac[e] incredible.") (quoting *Amalgamated Clothing and Textile Workers Union v. NLRB*, 736 F.2d 1559, 1563 (D.C. Cir. 1984)).

Accepting those fact findings as supported by substantial evidence, the Board did not err in concluding that Maxwell's actions were not the type of seriously coercive or intimidating behavior that forfeits a worker's protection under the National

Labor Relations Act. *See, e.g.*, *Consolidated Supply Co., Inc. & Successor Consol. Supply of Madison, Inc.*, 192 NLRB 982, 988–989 (1971) (blocking a company truck "momentarily" is "the sort of trivial, rough incident[] which [is] to be expected during a long, contested strike where an employer attempts to continue operating with nonstrikers"); *Medite of New Mexico, Inc. v. NLRB*, 72 F.3d 780, 791 (10th Cir. 1995) (a "brief incident" in which several picketers gathered around a vehicle, called the driver a "scab," and struck the car with picket signs, "does not amount to the type of serious conduct that would intimidate nonstriking employees from crossing the picket line and exercising their Section 7 rights").

By contrast, the cases on which Consolidated relies all involved more extreme or violent contact with and obstruction of non-strikers' vehicles than Maxwell was found to have engaged in here.[2]

---

[2] *See Siemens Energy & Automation, Inc.*, 328 NLRB 1175, 1176 (1999) (upholding discharge of striker that kicked a car passing through the picket line and threw roofing tacks onto the roadway at a vehicular entrance to the employer's plant); *GSM, Inc.*, 284 NLRB 174, 174–175 (1987) ("Conduct such as kicking, slapping, and throwing beer cans at moving vehicles is intimidating enough in and of itself," and constitutes "violent conduct which may reasonably tend to coerce or intimidate employees in the exercise of their rights protected under the Act."); *Teamsters Local 812 (Pepsi-Cola Newburgh)*, 304 NLRB 111, 115–117 (1991) ("The blocking, hitting and kicking of vehicles by pickets" constituted picket line misconduct, as did a "Family Day" in which striking employees and their families carried out mass picketing, and placed themselves and their small children in front of company trucks as they attempted to leave.); *CalMat Co.*, 326 NLRB 130, 135 (1998) (denying reinstatement for striker who "use[d] himself as a barrier

Because substantial evidence supports the Board's finding that Maxwell did not engage in misconduct justifying suspension, we deny that portion of Consolidated's petition and enforce the Board's order as it applies to Maxwell.

## B. Williamson

Eric Williamson, a switchman at Consolidated, was suspended for two separate incidents during the strike. Substantial evidence supported the Board's determination that neither instance of alleged misconduct was severe enough to warrant his suspension.

One evening during the strike, Williamson and other strikers stood along the driveway of the Rutledge Building parking lot waving signs and chanting. At around 5:00 p.m., non-striking employee Dawn Redfern drove her car as part of a slow caravan of vehicles leaving the parking lot. According to Redfern, she was turning right out of the parking lot when she heard a loud smack and immediately stopped her car. Turning her interior light on and rolling down her car window, she noticed that the passenger-side mirror was folded in. Redfern addressed a group of picketers, yelling, "you just hit my car." J.A. 611. Williamson purportedly responded, "No, you hit me." *Id.* at 612. A Huffmaster security guard came over and instructed Redfern to put her window up and keep driving, which she did. Redfern's husband later pushed the mirror back to its normal position. The car was not damaged.

---

so the driver would have no choice but to stop," and then proceeded to jump up onto the company truck, tear off the door handle, and try to assault the driver and damage the truck as security guards and police officers struggled to restrain him).

Williamson offered a different account of the incident. He acknowledged that he had been standing near Redfern's car as she pulled out, and that he "made sure she [had] seen [his] sign" and "tried to yell 'scab.'" J.A. 443. Williamson claimed that Redfern's passenger-side mirror "grazed [his] whistle on [his] chest," and "flexed in and flexed back." *Id.* Redfern then allegedly "hammered on her brakes[,] rolled her window down" and accused Williamson of breaking her mirror. *Id.* Williamson responded that she had hit him, and then he turned and walked away. He asked a Mattoon Police Department officer at the picket line if the officer had seen what had happened; the officer advised Williamson that he had done nothing wrong. During his testimony, Williamson repeatedly denied striking or pushing the mirror.

Williamson continued to picket at the Rutledge Building the following day. Non-striker Tara Walters testified that, as she arrived for work in the morning, Williamson looked towards her, grabbed his crotch, and "lifted up as a mean, hateful gesture." J.A. 629–630. Williamson denied grabbing his crotch, claiming that he just yelled "scab" at Walters. *Id.* at 440–441.

Consolidated accused Williamson of "threatening and intimidating a female * * * employee by striking her vehicle while * * * standing on the picket line," and of "sexual harassment" in "making inappropriate gestures toward a female * * * employee while she was parking her vehicle," J.A. 40. Williamson was suspended for violations of the "handbook/workplace violence policy" and the "handbook/sexual harassment policy." *Id.* at 31–32.

The Board found no factual basis for Consolidated's conclusion that Williamson intentionally struck Redfern's car mirror. That decision is amply supported by the record—or,

more accurately, the utter lack of any record evidence that Williamson intentionally struck Redfern's mirror as she drove by. Redfern herself conceded that she did not see "who did it," J.A. 619, or have any basis for concluding that Williamson acted with intentionality to damage her mirror. Video footage of the picket line around that time only shows Redfern's car driving by a group of strikers, with no footage of anyone at all coming into contact with the mirror. Accordingly, we uphold the Board's determination that Williamson did not engage in any misconduct with respect to Redfern.

With respect to the Tara Walters incident, the Board discredited Williamson's testimony and found that he did engage in misconduct by grabbing his crotch and making an obscene gesture toward Walters. The Board also held, however, that Williamson's actions were not sufficiently egregious to warrant suspension.

Consolidated argues (Br. 51) that the Board improperly "inferred a legal standard of violence" as necessary to permit discipline. That misreads the decision. The Board, in fact, acknowledged that Williamson's gesture was "totally uncalled for, and very unpleasant," but nonetheless concluded that his actions could not objectively be perceived "as an implied threat" of the kind that would coerce or intimidate a reasonable employee from continuing to report to work during the strike. J.A. 13. Given the rough-and-tumble nature of picket lines and the fleeting nature of Williamson's offensive misconduct, we cannot conclude that the Board erred in its assessment of the objective impact of this particular conduct in this instance. *See Allied Indus. Workers*, 476 F.2d at 879 ("'Impulsive behavior on the picket line is to be expected especially when directed against nonstriking employees or strike breakers.'") (quoting *Montgomery Ward & Co.*, 374

F.2d at 608 ); *NMC Finishing v. NLRB*, 101 F.3d 528, 532 (8th Cir. 1996) (noting the "rough and tumble economic activity permitted by the policies established by Congress through the NLRA").[3]

## C. Hudson

At the time of the strike, Patricia Hudson was an Office Specialist in the fleet department of Consolidated. In one day, she purportedly participated in three back-to-back incidents of driving her car in a manner that obstructed and trapped vehicles in which non-striking workers were driving. Concluding that Hudson had engaged in "harassing, intimidating, threatening and reckless behavior" towards non-strikers with "extremely dangerous vehicular activity on the strike line and on the public roads," J.A. 52, Consolidated discharged Hudson for violation of the "handbook/workplace violence and/or employee conduct and work rules policies," *id.* at 41.

The Board ruled that Hudson did not engage in any misconduct that would warrant discharge. The Board was two-thirds correct. Substantial evidence supports its findings

---

[3] The Board ruled in the alternative that, even if Williamson's conduct had been serious enough to forfeit the protection of the Act, Consolidated failed to meet its "burden" under *Wright Line*, 251 NLRB 1083 (1980), "to establish that it would have suspended Williamson solely on the basis of the Tara Walters incident." J.A. 13. That is a complete misstatement of the law. The *Wright Line* test applies "when an employer has discharged (or disciplined) an employee for a reason assertedly *unconnected to* protected activity." *Shamrock Foods*, 346 F.3d at 1135. It has no application to striker misconduct cases. We accordingly do not credit the Board's alternative ground for its disposition.

that Hudson's conduct toward non-strikers Sarah Greider and Kurt Rankin was not misconduct. But in analyzing the incident involving non-striker Troy Conley, the Board misapplied the governing legal standard.

### 1. The Greider and Rankin Incidents

On the morning of December 10, 2012, Hudson and Brenda Weaver walked the picket line at the Rutledge Building. At around 10:00 a.m., Hudson and Weaver decided to drive over to corporate headquarters to join the picket line there. Hudson and Weaver drove separately, with Hudson in front and Weaver behind.

Non-striker Sarah Greider left the Rutledge Building parking lot at about that same time. Greider claims that, as she approached the parking lot exit and prepared to turn onto 17th Street, Hudson pulled in front of her and Weaver pulled up behind, blocking her in. Greider testified that Hudson drove slowly and stopped and started several times, while Weaver followed immediately behind so that Greider could not back up. With parked cars and picketers on both sides of the roadway, 17th Street had been reduced to one lane, so Greider could not get around Hudson. After approximately 135–165 feet, Greider turned into the parking lot of an automobile dealership and cut across to a parallel street. Weaver did not follow her.

Greider called the Command Center and reported that Hudson and Weaver had "blocked [her] in." J.A. 653. She later completed an incident report claiming that Hudson had "refused to move or moved very slowly" in front of her car. *Id.* at 47–49.

Jonell Rich, another non-striker who witnessed the incident, testified that Hudson was in front of Greider going

"very slow, stopping, starting" on 17th Street, "and it stayed that way until [Greider] was able to turn into the [auto dealership] lot." J.A. 689. Immediately after the incident, Rich texted Greider: "I just saw what Pat Hudson did to you." *Id.* at 691.

Later that morning, Hudson and Weaver returned to the Rutledge Building, with Hudson driving her car and Weaver in the backseat. Around that time, manager Kurt Rankin drove his car toward an exit of the Rutledge parking lot. Rankin testified that Hudson's car was parked to the side of the road and surrounded by people, but that as soon as he came up to the exit, "everybody turn[ed] around and got her vehicle moving in front of [him]" by "motioning" her toward the right. J.A. 312–313. A Huffmaster guard held Rankin up as Hudson passed the exit. Rankin then turned right onto 17th Street behind Hudson, who was driving very slowly.

Rankin testified that Hudson "stop[ped] the brakes, move[d], stop[ped] the brakes," so that he was continually moving very slowly as Hudson "controll[ed] the speed at which [he] could exit and get out of there." J.A. 320. Hudson testified, however, that she was driving slowly because there were "picketers, cars parked on the side of the road, people crossing the road, [and] people coming in and out of [the auto dealership]." *Id.* at 529. When Rankin tried to speed up and go around Hudson, she allegedly swerved over into the left lane to prevent him from passing. As soon as he got past the vehicles parked along the road, Rankin put his truck into four-wheel drive and went around Hudson on the left by driving through a ditch. Rankin later filled out incident reports about the encounter.

Three non-striking employees—Tara Walters, Jonell Rich, and Bernice Dasenbrock—witnessed the incident,

testifying that Hudson proceeded very slowly in front of Rankin and moved to the left when Rankin tried to pass.

The Board ruled that there was no misconduct by Hudson in either incident. The Board found that on both occasions Hudson's car ended up in front of the non-strikers by coincidence due to the actions of the Huffmaster guard directing traffic leaving the parking lot. The Board also found that Hudson was driving slowly because of activity and congestion on the road, not to harass or annoy Greider or Rankin. Finally, the Board found that Hudson did not repeatedly start and stop in the road in front of Greider and Rankin. In so finding, the Board dismissed the witnesses' testimony as inconsistent or motivated by animus towards Hudson, and relied in part on the fact that neither the non-strikers nor Consolidated reported the incidents to the Mattoon Police Department.

Once again, substantial evidence supports the Board's conclusions. Video footage of the picket line shows Huffmaster personnel directing cars out of the parking lot, and in both incidents, a guard holds up the non-striker's car as Hudson's car drives by on 17th Street. In addition, record evidence supports the Board's finding that Hudson's slow pace was due to all the activity and congestion in the roadway rather than an intentional effort to harass or block Greider and Rankin. For example, Police Chief Jeffrey Branson testified that 17th Street is a "very well traveled road," and that when he first arrived at the Rutledge Building that morning, he "was upset because the road was so congested." J.A. 370–371. Chief Branson also observed "a large crowd in the roadway," *id.* at 372, and noted that cars leaving the facility were "taking care, driving slow, and they were all back to back," going "[t]wo miles an hour" "because the crowd was so close," *id.* at 373–374.

Similarly, Union representative Brad Beisner testified that 17th Street was significantly narrowed during the strike due to picketers parking along both sides of the road, and people getting in and out of their cars to stay warm and dry. Beisner also testified that members of the public and strikers were "driving slowly" on 17th Street during the strike, and that he would go five to ten miles an hour. J.A. 191. Video footage of the area during the strike shows picketers walking up and down the road holding signs and getting close to cars.

The Board also found no credible evidence that Hudson had started and stopped repeatedly in front of Greider and Rankin. Greider made no mention of Hudson stopping and starting in her incident report, and there is no record of her making such a claim to Consolidated managers at the Command Center at the time. The video footage of the Greider Incident, though limited, also does not show any evidence of stopping and starting. Rich's testimony was inconsistent as to whether and how often Hudson stopped in front of Greider. *Compare* J.A. 689 (testifying that she did not know if Hudson stopped more than once or whether Hudson actually came to a complete stop), *with id.* at 700–702 (testifying that she saw Hudson come to a complete stop in front of Greider twice).

Rankin testified that Hudson would "stop the brakes, move, stop the brakes," J.A. 320, but only noted Hudson "at some time totally stopp[ing]" in one incident report. Video footage of the incident shows Hudson's car slowing down after Rankin's truck turns behind it, and the two vehicles get very close to each other as they drive up 17th Street, but Hudson's car does not ever fully stop within view of the camera. Other testimony about the incident offered equivocal support at best for Rankin's version of events. Walters testified that she did not see Hudson start and stop in front of

Rankin, and Rich mentioned the two vehicles coming to a complete stop only when Rankin attempted to go around Hudson at some point.[4]

The Board also found conflicting evidence regarding Rankin's claim that Hudson moved to the left of the road to prevent him from passing. The allegation was not in Rankin's incident reports, and Rankin never told Consolidated prior to Hudson's discharge that she swerved or that he twice tried to pass her. To be sure, Walters and Rich testified that they saw Hudson move to the left in front of Rankin, but the general reliability of their testimony was undermined by noteworthy gaps or inconsistencies. For example, neither Walters nor Rich remembered any vehicles passing Hudson and Rankin going south on the other side of 17th Street—something about which Rankin, Weaver, and Hudson all testified.

When confronted with competing versions of evidence, we defer to the Board's credibility determinations absent the starkest error. *See NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1477 (7th Cir. 1992). We therefore hold that

---

[4] Consolidated complains that the Board improperly imposed a duty on the employer to contact the police about these incidents. Such contact, while certainly not dispositive, can be a factor relevant to witness credibility and the seriousness of the misconduct in question. *See, e.g.*, *Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105, 1108 (8th Cir. 1992) (threatened employer's call to police was evidence of the threat); *Axelson, Inc.*, 285 NLRB 862, 865 (1987) (the "threatening, intimidating character" of striker's statement was apparent where non-striker felt threatened enough to report the incident to the police). Anyhow, the Board's reliance on that factor was limited in the Greider and Rankin incidents, and substantial evidence would exist even without consideration of that factor.

substantial evidence underlay the Board's determinations that Hudson did not engage in misconduct in the Greider and Rankin incidents.

## 2. The Conley Incident

Between the Greider and Rankin Incidents, as Hudson and Weaver were en route in separate cars to picket at Consolidated's corporate headquarters, Hudson noticed a company truck on Route 16, a four-lane highway in Mattoon. Manager Troy Conley was driving, and replacement worker Larry Diggs was a passenger. Hudson testified that she decided to follow the truck to see if it was traveling to a commercial worksite where striking employees could set up an ambulatory picket. Weaver followed her. What happened next is strongly disputed.

Conley testified that he was driving east in the right lane on Route 16, when he heard honking and saw Weaver drive up in the left lane beside him with a picket sign in her passenger seat. She went past Conley's truck, signaled and moved into the right lane in front of him. Less than a minute later, Conley saw Hudson drive up in the left lane, pass him, and proceed parallel to Weaver. Conley then "saw some hand motioning going on by Pat [Hudson], and they immediately slowed both cars down." J.A. 537.[5] Conley did not know

---

[5] Hudson and Weaver testified that they had not previously discussed following company vehicles, and were not able to communicate with each other during the drive because Hudson did not have a cell phone. Hudson had decided on her own to follow Conley when she saw him turning onto Route 16. Weaver testified that she followed without initially knowing what Hudson was doing, but eventually noticed the company truck and assumed

how fast any of the cars were traveling, and he conceded that Weaver and Hudson could have been driving the speed limit while in front of him.[6]

Conley testified that he slowed down, signaled, and went into the left lane behind Hudson to see if she would let him pass. She did not. Conley then moved back into the right lane behind Weaver. At some point, three cars came up behind Hudson in the left lane, and she moved in to the right lane ahead of Weaver to allow them to pass her. Conley signaled left and moved into the left lane behind the third car, but again could not pass because Hudson moved back into the left lane, intentionally cutting him off. Conley slowed down and moved back into the right lane behind Weaver.

Conley subsequently turned off of the road, even though it was not the most direct route to the job site, because he "was feeling very harassed" and "was trying to avoid conflict." J.A 540. As a result, Conley had to drive a longer route to his destination. Once he reached the job site, Conley called the Command Center to report what had happened, and later filled out an incident report.

Diggs, Conley's passenger, testified that he saw one car come speeding up beside their truck, stop and look for a moment, and then pull in front of the truck. He testified that a second car then pulled up beside the first car and "both of them slowed down at a fairly fast pace." J.A. 591. Diggs explained that, "after [other] cars started stacking up behind

---

Hudson was following it to see if it was going to a commercial worksite.

[6] The speed limit on Route 16 in that area generally ranges from 45 to 55 mph.

[the truck],” he “saw some motion between the two cars that were in front of us.” *Id.* at 592. The car in the left lane (Hudson) pulled in front of the car in the right lane (Weaver) to let the stacked cars come through. But when Conley attempted to pass, the two cars “pulled back, paralleling each other, and continued to block us from going at the normal speed that we were trying to travel at.” *Id*. Diggs did not know whether Hudson and Weaver were driving at the speed limit and conceded that they could have been, but added that “they were traveling much slower than everyone else was traveling prior to them pulling in front of us.” *Id.* at 597.

Weaver and Hudson had a different recollection from Conley and Diggs. According to Weaver, she had decided to pull up beside the truck to “see who was driving * * *, so that if we followed him to a site where we could picket, we could report it back to the Union.” J.A. 413. She also said that she wanted to find out if the driver was someone with “the credentials to drive the type of truck he[] [was] driving to do the work,” such as a commercial driver’s license, *id.*, although she conceded that she was unaware of any special requirements to drive a pickup truck.[7] Weaver testified that she was driving at “normal speed—the speed limit,” J.A. 403, and that Hudson did not cut Conley off.

Hudson testified that she had no idea why Weaver passed Conley or “what her intentions were,” but she also passed Conley in order to “stay with Brenda [Weaver].” J.A. 481, 516–518. Hudson denied that she and Weaver paralleled their vehicles in front of Conley to create a rolling blockade or that she ever cut off Conley. Instead, Hudson said she just passed Conley in the left lane and then pulled into the right lane

[7] Conley testified to driving a four-wheel drive Chevy truck that did not require a commercial driver’s license.

between Weaver and Conley. She also did not recall Conley ever changing lanes or trying to pass.

Hudson and Weaver did not follow Conley after he turned off of the road because they could not turn their cars around at that point in the highway. Hudson and Weaver also testified that, because Conley turned off, they each assumed he was heading to a residential, not a commercial, location, where strikers could not picket.

Consolidated argues that the Conley Incident, which occurred on a public highway approximately three miles away from the picket line, should not have been subject to the striker misconduct standard at all, but instead should have been evaluated as ordinary employee misconduct. Consolidated also argues that, even under the striker misconduct standard, Hudson's behavior was sufficiently serious to forfeit the protection of the National Labor Relations Act. We reject Consolidated's first argument, but conclude that the Board committed reversible legal error in evaluating Hudson's misconduct.

On the question of whether the Conley incident qualified as strike-related behavior, the General Counsel bears the burden of showing that Hudson's conduct occurred "in the course of" the strike. *Shamrock Foods*, 346 F.3d at 1136; *Burnup & Sims*, 379 U.S. at 23. Conduct need not occur at the picket line to be "in the course of protected activity." Confrontations between striking and non-striking employees are typically treated as strike-related conduct even when they occur miles away from the picket line or strike site. *See, e.g.*, *Consolidated Supply Co.,* 192 NLRB at 988–989 (following company truck onto roadway, forcing it to drive slowly, and blocking it); *Axelson*, 285 NLRB at 865 (following non-striker home, cruising slowly past his house, and parking

close enough to see and be seen); *Gibraltar Sprocket Co.*, 241 NLRB 501, 501–502 (1979) (following non-striker's car); *Otsego Ski-Club-Hidden Valley, Inc.*, 217 NLRB 408, 413 (1975) (same); *Federal Prescription Serv., Inc.*, 203 NLRB 975, 993 (1973) (same).

For example, in *Detroit Newspaper Agency d/b/a Detroit Newspapers v. NLRB*, 342 NLRB 223, 236–237 (2004), a striker had parked in front of a Cracker Barrel Store along with his wife and two young children when he noticed a company van parked nearby. The striker and his family engaged in a confrontation with the driver in which they repeatedly called him a "scab" and slapped the driver's van. *Id.* at 236. The employer discharged the striker, reasoning that, "because there was no picket line or any strike-related activity going on in the vicinity," the striker-misconduct analysis should not be applied. *Id.* The Board disagreed, finding that the striker "was on strike at the time of this incident, which involved his attempt to remonstrate with an employee concerning his status as a strike replacement, and that in doing so he was exercising rights protected by the Act." *Id.* The Board further explained that, to obtain protection under the striker-misconduct standard, "[t]here is no requirement that" the employee "be a part of some kind of formal strike-related activity." *Id.* The Board also noted "that the [employer] considered [the discharged employee] to be a striker, and that it handled the matter according to the procedures it had set up for reporting, investigating, and taking action on incidents of alleged misconduct by striking employees." *Id.*

In other words, geography by itself is not dispositive of whether conduct is strike related. The central consideration instead is whether the employee undertakes the conduct for a purpose related to or in furtherance of the strike. *See Burnup*

& *Sims*, 379 U.S. at 23–24. Moreover, Consolidated's reliance on location is particularly inapt here because the company had facilities in multiple locations and worksites in still more.

Accordingly, Hudson's conduct falls comfortably within the zone of strike-related activity covered by the National Labor Relations Act. The Conley incident took place when Hudson was traveling between picket sites and was scoping out potential alternative locations for ambulatory pickets. Moreover, Consolidated itself must have understood that strike-related purpose because it treated the Conley Incident as striker misconduct, dealing with Hudson through its established procedures for such conduct.[8]

However, we vacate the Board's determination that Hudson did not engage in misconduct punishable under the Act because the Board's determination rests on a misapplication of the *Clear Pine Mouldings* standard and the *Burnup & Sims* burden of proof.

The central legal question before the Board was whether Hudson's driving behavior—on a public highway with vehicles traveling at speeds of 45 to 55 mph, and with uninvolved third-party vehicles in the area—"may reasonably tend to coerce or intimidate" Consolidated employees like Conley and Diggs. *Clear Pine Mouldings*, 268 NLRB at 1046. The burden of proof on that question rests squarely on the General Counsel's shoulders. The General Counsel must establish either that no misconduct occurred, or that the

---

[8] Accordingly, the distinction Consolidated attempts to draw between *following* Conley and being *in front of* Conley on Route 16 is irrelevant, since Hudson was engaged in conduct related to the strike either way.

misconduct was not of sufficient severity to forfeit the law's protection of striker activity. *See Axelson*, 285 NLRB at 864; *Schreiber Mfg.*, 725 F.2d at 416.

The Board misapplied that standard here. The Board decision stressed the "absence of violence." J.A. 12; *see id*. at 9–10. But that asked the wrong question. The legal test to be applied is straightforwardly whether the striker's conduct, taken in context, "reasonably tended to intimidate or coerce any nonstrikers." *Batesville Casket Co.*, 303 NLRB 578, 581 (1991); *see Clear Pine Mouldings*, 268 NLRB at 1045–1046 (expressly rejecting a requirement of violence and instead adopting an "objective test" of "whether the misconduct is such that, *under the circumstances existing*, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act") (emphasis added) (internal quotation marks and citations omitted). While violence or its absence can be relevant factors in that reasonableness analysis, the Board had to take the next analytical step. It had to consider, consistent with precedent, *all* of the relevant circumstances, and evaluate the objective impact on a reasonable non-striker of misconduct committed on a high-speed public roadway with third-party vehicles present. *See, e.g.*, *Oneita Knitting Mills, Inc. v. NLRB*, 375 F.2d 385, 392 (4th Cir. 1967) (strikers who drove their car in front of a non-striker's car, would not permit the non-striker to pass, and shouted obscene remarks and names had engaged in misconduct "which was calculated to intimidate the non-strikers, and which was inherently dangerous in that it involved obstruction of the public highway"); *International Paper Co.*, 309 NLRB 31, 36 (1992) (striker engaged in "hazardous driving designed * * * to intimidate replacement employees and other of Respondent's personnel," including following non-strikers cars "dangerously close" with his truck, driving and weaving alongside them closely, and "after

passing them, driving at a speed designed to assure only a small separation between the two vehicles thus creating a danger of collision"), *enf'd sub nom. Local 14, United Paperworkers Int'l Union v. NLRB*, 4 F.3d 982 (1st Cir. 1993) (Table).

Compounding its error, the Board held that "any ambiguity as to whether [Hudson's misconduct] was serious enough to forfeit the protection of the Act should be resolved against [Consolidated]." J.A. 13. That improperly shifted the burden of proof from the General Counsel to Consolidated. Because the General Counsel bears the burden of proving that the misconduct is shielded by the Act, any ambiguity or equivocation in the evidence on the question of the conduct's seriousness "must be resolved in favor of the employer[.]" *Axelson*, 285 NLRB at 864.[9]

Those legal errors in application of the striker misconduct standard require that we grant this portion of Consolidated's petition for review, vacate the Board's decision on Hudson's discharge, and remand for further proceedings.[10]

**IV**

---

[9] That the Board had articulated the burden of proof properly earlier in the decision, J.A. 13, is of no help when the law is flatly misstated in the dispositive analysis of a specific argument.

[10] We take the Board at its word that, on remand, it will not "rely on the [ALJ's] speculation as to what might have motivated Troy Conley's testimony," given the total absence of record evidence that could support the ALJ's findings of bias, anger, or a desire to see Hudson terminated. J.A. 1 n.2.

Consolidated argues lastly that the Board failed to make the necessary findings of fact and provided no legal analysis in determining that Consolidated violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) & (1), in unilaterally eliminating the Office Specialist-Facilities position. That claim has no merit.

It is well-established that an employer commits an unfair labor practice if it makes a unilateral change in a term or condition of employment involving a mandatory subject of bargaining without bargaining to impasse. *See Brewers and Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 41–42 (D.C. Cir. 2005); *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 198–199 (1991). The elimination of bargaining-unit jobs is a mandatory subject of bargaining within the meaning of Section 8(a)(5) of the Act. *See Finch, Pruyn & Co., Inc.*, 349 NLRB 270, 277 (2007) ("The Board has long held the elimination of unit jobs, albeit for economic reasons, is a matter within the statutory phrase 'other terms and conditions of employment' and is a mandatory subject of bargaining[.]") (citation omitted); *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 310–312 (D.C. Cir. 2003) (company violated Section 8(a)(5) in eliminating bargaining-unit positions and transferring work to managers without first bargaining with union).

Here, the Board specifically found that Consolidated decided in January or February 2014 not to fill Brenda Weaver's job as the Office Specialist in the Facilities Department, and assigned some of the duties of that position to another position. The Board also found that Consolidated did not provide the Union with advance notice or an opportunity to bargain about its decision to eliminate the position, which reduced the size of the bargaining unit.

Because Consolidated had a duty under settled law to notify and bargain with the Union before reassigning job duties and eliminating the Office Specialist-Facilities position, the Board properly concluded that Consolidated violated Section 8(a)(5). Those essential facts are all that is necessary to find a violation of the duty to bargain. *See Finch, Pruyn & Co.*, 349 NLRB at 277 ("It is undisputed that the [employer] never bargained with [the union] over the elimination of the [unit] position. The [employer]'s unilateral action and failure to fulfill its bargaining obligation is thus plainly established on the record before us.").

Consolidated argues that the parties stipulated that Weaver's position of Office Specialist was never "eliminated," and that Consolidated continues to employ Office Specialists in the bargaining unit. But that misreads the stipulation. It does *not* say that the Office Specialist-Facilities position was preserved. The stipulation instead reiterates that Consolidated planned to abandon filling the position and to transfer Weaver's duties to other employees.[11] That Consolidated continues to employ Office Specialists elsewhere in the company is beside the point. The bargaining unit is still down by one if Weaver's position is eliminated.

---

[11] *See* J.A. 55 ("February 26, 2013 was the first time the Employer informed the Union of the decision not to fill one of the vacated Office Specialist positions."); *id.* at 56 (Consolidated later attempted to "discuss/bargain over not filling Weaver's position" and "offered several options regarding the Office Specialist duties that Weaver previously performed, including 1) paying the Office Specialist who was performing new duties a premium; 2) diffusing the duties even further and sharing with other Office Specialists; or 3) moving the duties to a Company affiliate.").

Consolidated also contends that it has responded and agreed to the Union's request for bargaining. Perhaps. But that was only *after* Consolidated had already decided to eliminate the Office Specialist-Facilities position. That does not suffice. The bargaining must come before the position is eliminated. *See Brewers and Maltsters*, 414 F.3d at 42 ("[A]n employer's unilateral change in a term or condition of employment *without first bargaining* to impasse violates section 8(a)(5) and (1).") (emphasis added); *International Ladies' Garment Workers Union v. NLRB*, 463 F.2d 907, 919 (D.C. Cir. 1972) ("[N]o genuine bargaining * * * can be conducted where [the] decision has already been made and implemented.") (citation omitted) (alterations in original).

**V**

For the foregoing reasons, we grant Consolidated's petition for review and deny the Board's application for enforcement with respect to Consolidated's discharge of Patricia Hudson. We deny the petition for review and enforce the Board's order in all other respects, and remand for further proceedings on the Hudson discharge consistent with this opinion.

*So ordered.*

1

MILLETT, *Circuit Judge*, concurring: As the opinion explains, our deferential standard of review and the record in this case support the conclusion that Eric Williamson's offensive, but fleeting and isolated, obscene gesture did not amount to striker misconduct so egregious that it forfeited the protection of the National Labor Relations Act.

I write separately, though, to convey my substantial concern with the too-often cavalier and enabling approach that the Board's decisions have taken toward the sexually and racially demeaning misconduct of some employees during strikes. Those decisions have repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace. The sexually and racially disparaging conduct that Board decisions have winked away encapsulates the very types of demeaning and degrading messages that for too much of our history have trapped women and minorities in a second-class workplace status.

While the law properly understands that rough words and strong feelings can arise in the tense and acrimonious world of workplace strikes, targeting others for sexual or racial degradation is categorically different. Conduct that is designed to humiliate and intimidate another individual *because of and in terms of that person's gender or race* should be unacceptable in the work environment. Full stop.

Yet time and again the Board's decisions have given short shrift to gender-targeted behavior, the message of which is calculated to be sexually derogatory and demeaning. According to Board precedent, such conduct was supposedly not extreme enough to constitute a "threat." For example, in *Calliope Designs*, 297 NLRB 510 (1989), the Board ruled that a striker calling a non-striker a "whore" and a "prostitute,"

and adding that she was "having sex with [the employer's] president," was not "serious misconduct" and thus was not sanctionable, *id*. at 521.  That same striker repeatedly called a second female employee "a 'whore' and told [her] she could earn more money by selling her daughter, another nonstriker, at the flea market."  *Id*.  Completely protected, the Board decision said.

Similarly, in *Gloversville Embossing Corp.*, 297 NLRB 182 (1989), the Board's ruling deemed it acceptable for a striker to yell at female non-strikers to come see "a real man" and then to "pull[] down his pants and expose[] himself," *id*. at 193–194.  And in *Robbins Company*, 233 NLRB 549 (1977), the Board's order required the reinstatement of a striker who "made crude and obscene remarks and suggestions regarding sex, including an invitation to 'make some extra money at his apartment that night'" to a female employee, *id.* at 557.  *See also Nickell Moulding*, 317 NLRB 826, 828 (1995), *enforcement denied*, *NMC Finishing v. NLRB*, 101 F.3d 528, 532 (8th Cir. 1996) (reinstating striker who targeted a non-striker by carrying on the picket line a homemade sign reading "Who is Rhonda F [with an X through F] Sucking Today?").

The Board's rulings have been equally unmoved by racially derogatory and demeaning epithets and behavior. *See, e.g.*, *Airo Die Casting, Inc.*, 347 NLRB 810, 811–812 (2006) (protecting a striker who raised both middle fingers and shouted "fuck you nigger" at an African-American security guard); *Cooper Tire & Rubber Co. and United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union*, 363 NLRB No. 194 (2016) (requiring reinstatement of picketer who called out:  "Did you bring enough KFC for everybody?" and "Hey, anybody smell that?  I smell fried chicken and

watermelon," in reference to African-American replacement workers).

Nothing in the Board's decisions has offered any plausible justification, and I can conceive of none, for concluding that the rights of workers—all workers—are protected by turning picket lines into free zones for sexually or racially abusive and demeaning conduct. Instead, the Board's rulings dismiss such abhorrent behavior as "unpleasantries" that are just part and parcel of the contentious environment and heated language that ordinarily accompany strike activity. *Gloversville*, 297 NLRB at 194 ("[N]onstriking employees and replacement workers must be prepared to contend with some unpleasantries in a strike situation. * * * [The striker's] conduct, while censurable, is within the bounds of permissible picket line misconduct[.]"); *see also Airo Die Casting, Inc.*, 347 NLRB at 812 ("[The striker's] conduct on the picket line, the use of obscene language and gestures and a racial slur, standing alone without any threats or violence, did not rise to the level where he forfeited the protection of the Act."); *Polynesian Hospitality Tours*, 297 NLRB 228, 252 (1989) ("While one can sympathize with [the female manager] because of the rudeness and vulgarity demonstrated toward her, * * * [none of the activity] ever reached the level that it would * * * even come close to removing an employee from the protection of the Act * * * [since no misconduct] went beyond the use of epithets, vulgar words, profanity, vulgar gestures, and the like.").

There is no question that Emily Post rules do not apply to a strike. "[S]ome types of impulsive behavior must have been within the contemplation of Congress when it provided for the right to strike." *Allied Indus. Workers, AFL-CIO Local Union No. 289*, 476 F.2d 868, 879 (D.C. Cir. 1973). Accordingly,

4

when looking at the "rough and tumble of an economic strike," *NMC Finishing v. NLRB*, 101 F.3d 528, 531 (8th Cir. 1996), the Board can quite appropriately make allowance for "a trivial rough incident," *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 293 (1941), and can certainly leave room for the "normal outgrowths of the intense feelings developed on picket lines," *NLRB v. Wichita Television Corp.*, 277 F.2d 579, 585 (10th Cir. 1960). *See also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 272–273 (1974) (noting that federal labor policies "favor[] uninhibited, robust, and wide-open debate in labor disputes," and that "freewheeling use of the written and spoken word * * * has been expressly fostered by Congress and approved by the [Board]"); *id.* at 283 ("Federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point.").

So giving strikers a pass on zealous expressions of frustration and discontent makes sense. Heated words and insults? Understandable. Rowdy and raucous behavior? Sure, within lawful bounds. But conduct of a sexually or racially demeaning and degrading nature is categorically different. Calling a female co-worker a "whore" or exposing one's genitals to her is not even remotely a "normal outgrowth[]" of strike-related emotions. In what possible way does propositioning her for sex advance any legitimate strike-related message? And how on earth can calling an African-American worker "nigger" be a tolerated mode of communicating worker grievances?

Such language and behavior have nothing to do with attempted persuasion about the striker's cause. Nor do they convey any message about workplace injustices suffered,

wrongs inflicted, employer mistreatment, managerial indifference, the causes of employee frustration and anger, or anything at all of relevance about working conditions or worker complaints. Indeed, such behavior is flatly forbidden in every other corner of the workplace because it is dangerously wrong and breathes new life into economically suffocating and dehumanizing discrimination that we have labored for generations to eliminate. Brushing that same behavior off when it occurs during a strike simply legitimates the entirely illegitimate, and it signals that, when push comes to shove, discriminatory and degrading stereotypes can still be a legitimate weapon in economic disputes.

Tellingly (and thankfully), it seems to be an isolated few who undertake such abusive behavior. The overwhelming majority of those involved in strikes are able to effectively communicate their grievances and viewpoints without resort to racial- or gender-based attacks. That just proves that there is no legitimate communicative or organizational role for such misconduct.

And by the way, the Board is supposed to protect the rights of all employees covered by the Act. *See Rights We Protect*, National Labor Relations Board, https://www.nlrb.gov/rights-we-protect (last visited Aug. 17, 2016) ("The National Labor Relations Board protects the rights of most private-sector employees to join together, with or without a union, to improve their wages and working conditions."). Holding that such toxic behavior is a routine part of strikes signals to women and minorities both in the union and out that they are still not truly equals in the workplace or union hall. For when the most important labor/management battles arise and when the economic livelihood of the employer and the employees is on the line, the Board's decisions say that racial and misogynistic

epithets, degrading behavior, and race- and gender-based vilification are once again fair game.

We have cautioned the Board before against assuming that "the use of abusive language, vulgar expletives, and racial epithets" between employees "is part and parcel of the vigorous exchange that often accompanies labor relations." *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 24 (D.C. Cir. 2001) (internal quotation marks omitted). It is both "preposterous" and insulting to ensconce into labor law the assumption that "employees are incapable of organizing a union or exercising their other statutory rights under the National Labor Relations Act without resort to abusive or threatening language" targeted at a person's gender or race. *Id.* at 26; *see also id.* (expressing concern about a Board decision indicating that "it is perfectly acceptable to use the most offensive and derogatory racial or sexual epithets, so long as those using such language are engaged in union organizing or efforts to vindicate protected labor activity").

In this case, the Board also reasoned that crotch-grabbing must be condoned because it was not a threat to the female employee that Williamson targeted. Maybe not in this instance given the absence of record evidence documenting an adverse effect on Walters. But the problem is that the Board's decisions seem in too many cases to answer that question from the perpetrator's perspective, oblivious to the dark history such words and actions have had in the workplace (and elsewhere). *See, e.g.*, *Airo Die Casting, Inc.*, 347 NLRB at 812 (finding testimony from management officials about the reaction of a security guard targeted with a racial slur— "visibly shaken and offended"—to be "somewhat exaggerated" because "anyone examining the actual [video] recording of [the striker's] activity would be hard pressed to

see any threatening or aggressive conduct"); *Polynesian Hospitality Tours*, 297 NLRB at 252 ("[W]hile * * * one must concede that employees' conduct was somewhat rude and vulgar, it seems scarcely surprising * * * that some of them became angry at [the manager], referred to her as a 'bitch,' and that some of them yelled that she should be fired[.] * * * [T]he actions of the employees in this case [are] valid protests of a supervisor's illegal actions against them."); *Cooper Tire & Rubber Co.*, 363 NLRB No. 194 (finding that, "even though [the picketer's] statements were offensive and racist, and certainly may have been disrespectful to the dignity and feelings of African-American replacement workers, there is no evidence to establish that the statements contained overt or implied threats, that they coerced or intimidated employees in the exercise of their rights protected under the Act, or that they raised a reasonable likelihood of an imminent physical confrontation").

Nor do the Board's decisions grapple with the enduring effects in the workplace of such noxious language and behavior. The assumption that such gender- and race-based attacks can be contained to the picket line blinks reality. It will often be quite hard for a woman or minority who has been on the receiving end of a spew of gender or racial epithets—who has seen the darkest thoughts of a co-worker revealed in a deliberately humiliating tirade—to feel truly equal or safe working alongside that employee again. Racism and sexism in the workplace is a poison, the effects of which can continue long after the specific action ends. *Cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("'One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional psychological stability of minority group workers[.]'") (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972)); *Harris v. Forklift Sys.*,

510 U.S. 17, 22 (1993) ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing their careers.").

Accordingly, if the Board's decisions insist on letting the camel's nose of racial and gender discrimination into the work environment, the Board should also think long and hard about measuring the "threats" associated with such sexually or racially degrading behavior from the perspective of a reasonable person in the target's position, and how nigh impossible it is to cabin racism's and sexism's pernicious effects. *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (Under Title VII, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'") (quoting *Harris*, 510 U.S. at 23).

To be sure, employees' exercise of their statutory rights to oppose employer practices must be vigorously protected, and ample room must be left for powerful and passionate expressions of views in the heated context of a strike. But Board decisions' repeated forbearance of sexually and racially degrading conduct in service of that admirable goal goes too far. After all, the Board is a component of the same United States Government that has fought for decades to root discrimination out of the workplace. Subjecting co-workers and others to abusive treatment that is targeted to their gender, race, or ethnicity is not and should not be a natural byproduct of contentious labor disputes, and it certainly should not be accepted by an arm of the federal government. It is 2016, and "boys will be boys" should be just as forbidden on the picket line as it is on the assembly line.